UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| STANLEY J. MADAY,<br><br>        Plaintiff,<br><br>  vs.<br><br>**BOB DOOLEY**, CHIEF WARDEN AT MIKE DURFEE STATE PRISON, INDIVIDUAL AND OFFICIAL CAPACITY; **DENNIS KAEMINGK**, SECRETARY OF THE SOUTH DAKOTA DOC, INDIVIDUAL AND OFFICIAL CAPACITY; **DR. MARY CARPENTER**, DIRECTOR OF THE DEPARTMENT OF HEALTH, INDIVIDUAL AND OFFICIAL CAPACITY; **JENNIFER STANWICK-KLIMEK**, DEPUTY WARDEN AT MIKE DURFEE STATE PRISON, INDIVIDUAL AND OFFICIAL CAPACITY; **REBECCA SCHIEFFER**, ASSOCIATE WARDEN AT MIKE DURFEE STATE PRISON, INDIVIDUAL AND OFFICIAL CAPACITY; **ALEJANDRO REYES**, ASSOCIATE WARDEN AT MIKE DURFEE STATE PRISON, INDIVIDUAL AND OFFICIAL CAPACITY; **BRENT FLUKE**, ASSOCIATE WARDEN AT MIKE DURFEE STTAE PRISON, INDIVIDUAL AND OFFICIAL CAPACITY; **JOSH KLIMEK**, UNIT MANAGER AT MIKE DURFEE STATE PRISON, INDIVIDUAL AND OFFICIAL CAPACITY; **TRAVIS TJEERDSMA**, CASE MANAGER AT MIKE DURFEE STATE PRISON, INDIVIDUAL AND OFFICIAL CAPACITY; **TAMMY DEJONG**, CASE MANAGER AT MIKE DURFEE STATE PRISON, INDIVIDUAL AND OFFICIAL CAPACITY; **PA MICHAEL JOE HANVEY**, MEDICAL PROVIDER AT MIKE DURFEE STATE PRISON, INDIVIDUAL AND OFFICIAL CAPACITY; **DR. STEPHAN SCHROEDER**, MEDICAL PROVIDER AT MIKE DURFEE STATE PRISON, | 4:17-CV-04168-KES<br><br><br><br><br>REPORT AND RECOMMENDATION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT<br><br>DOCKET NOS. 125 & 145<br><br>--AND—<br><br>ORDER DENYING STANLEY MADAY'S MOTION TO STRIKE, MOTION TO AMEND HIS COMPLAINT, MOTION FOR DISCOVERY & APPOINTMENT OF COUNSEL, AND MOTION FOR SANCTIONS<br><br>DOCKET NOS. 155, 165, 170, 175 & 176<br><br>--AND—<br><br>DENYING DEFENDANTS' MOTION FOR SANCTIONS<br><br>DOCKET NO. 184 |

INDIVIDUAL AND OFFICIAL
CAPACITY; **MISTY TOLSMA-HANVEY**,
NURSING SUPERVISOR, AT MIKE
DURFEE STATE PRISON INDIVIDUAL
AND OFFICIAL CAPACITY; **LINDSEY
RABBASS**, NURSE AT MIKE DURFEE
STATE PRISON, INDIVIDUAL AND
OFFICIAL CAPACITY; **ROBIN MYER**,
NURSE AT MIKE DURFEE STATE
PRISON, INDIVIDUAL AND OFFICIAL
CAPACITY; **CANDICE FEJFAR**,
NURSE AT MIKE DURFEE STATE
PRISON, INDIVIDUAL AND OFFICIAL
CAPACITY; **DAYNA KLAWITTER**,
NURSE AT MIKE DURFEE STATE
PRISON, INDIVIDUAL AND OFFICIAL
CAPACITY; **DENNIS CROPPER**,
CORRECTIONAL OFFICER AT MIKE
DURFEE STATE PRISON, INDIVIDUAL
AND OFFICIAL CAPACITY; **THOMAS
HUITEMA**, CORRECTIONAL OFFICER
AT MIKE DURFEE STATE PRISON,
INDIVIDUAL AND OFFICIAL
CAPACITY; **MICHAEL MEYER**,
CORRECTIONAL OFFICER AT MIKE
DURFEE STATE PRISON, INDIVIDUAL
AND OFFICIAL CAPACITY; **LORI
STRATMAN**, CORRECTIONAL
OFFICER AT MIKE DURFEE STATE
PRISON, INDIVIDUAL AND OFFICIAL
CAPACITY; **MIKE GROSSHUESCH**,
CORRECTIONAL OFFICER AT MIKE
DURFEE STATE PRISON, INDIVIDUAL
AND OFFICIAL CAPACITY; **NICOLE
ST. PIERRE**, CORRECTIONAL
OFFICER AT MIKE DURFEE STATE
PRISON, INDIVIDUAL AND OFFICIAL
CAPACITY; **MURIEL NAMMINGA**,
LAUNDRY SUPERVISOR AT MIKE
DURFEE STATE PRISON, INDIVIDUAL
AND OFFICIAL CAPACITY;
**CATHERINE SCHLIMGEN**, LEGAL
COUNSEL FOR THE SOUTH DAKOTA
DOC, INDIVDUAL AND OFFICIAL
CAPACITY; UNKNOWN SOUTH
DAKOTA DOC EMPLOYEES,
INDIVIDUAL AND OFFICIAL
CAPACITES;  UNKNOWN SOUTH
DAKOTA DOH EMPLOYEES,
INDIVIDUAL AND OFFICIAL
CAPACITIES; **JON E. LITSCHER**,
SECRETARY OF THE WISCONSIN
DOC, INDIVIDUAL AND OFFICIAL

CAPACITY; **KATHARINE A. ARISS**, ASSISTANT LEGAL COUNSEL FOR THE WISCONSIN DOC, INDIVIDUAL AND OFFICIAL CAPACITY; **THOMAS P. MALONEY**, LIBRARY SERVICES AND EDUCATIONAL TECHNOLOGY COORDINATOR FOR THE WISCONSIN DOC, INDIVIDUAL AND OFFICIAL CAPACITY;  UNKNOWN WISCONSIN DOC EMPLOYEES, INDIVIDUAL AND OFFICIAL CAPACITIES;

Defendants.

# Table of Contents

INTRODUCTION ............................................................................. 1

FACTS ........................................................................................... 1

   A.  Maday's Complaint and Supplement—Docket Nos. 1 & 94 ..................... 1

   B.  Defendants' Statement of Undisputed Material Facts and ...................... 5

DISCUSSION ................................................................................. 7

   A.  Summary Judgment Standard ................................................. 7

   B.  The Law of Qualified Immunity ............................................... 9

   C.  Statute of Limitations ....................................................... 12

   D.  Deliberate Indifference to Serious Medical Needs ........................... 15

      1.  The Standard for Evaluating Deliberate Indifference Claims ............. 15

      2.  Lack of Properly Fitting Shoes ............................................. 17

      3.  Allowing Non-medical Staff to Decide Proper Footwear ..................... 23

      4.  Failure to Treat Mr. Maday's Plantar Fasciitis ............................ 24

      5.  Failure to Treat a Fracture in Mr. Maday's Foot for 9 Days ............... 26

      6.  Removal of Arch Supports for 13 days ...................................... 31

      7.  Failure to Properly Treat Foot Fracture in August, 2016 ................... 33

      8.  Failure to Provide Properly Fitting Diabetic Socks ........................ 36

   E.  First Amendment Claims .................................................... 40

      1.  February, 2016, Issue of Sports Illustrated Swimsuit Edition ............ 40

      2.  First Amendment Free Speech Rights in Prison .............................. 45

      3.  2015 SI Swimsuit Edition ................................................... 47

         a.  Qualified Immunity as to Money Damages ................................... 47

b.      Injunctive Relief/Official Capacity Claim ...................................... 52

4.      Deprivation of Hardcover Books ....................................................... 53

5.      Denial of Mail Because it Contained Colored Paper .......................... 58

6.      Rejection of Letter from Mr. Maday's Brother ................................. 61

F.      Denial of Access to the Courts Claims ................................................. 64

1.      The Law Applicable to Denial of Access to the Courts Claims ........... 64

2.      Application of the Law to Mr. Maday's Claims ................................. 66

G.      Retaliation Claims .............................................................................. 73

1.      The Law Applicable to Retaliation Claims ........................................ 73

2.      Discipline—Segregation in the SHU ................................................. 77

3.      Taking of the Arch Supports ............................................................ 82

4.      Censorship of Mr. Maday's Mail ...................................................... 83

H.      ADA Claims ....................................................................................... 84

1.      Applicable ADA Law......................................................................... 84

2.      The Turner Analysis Applies in Some Fashion to ADA Claims ........... 89

3.      Applying the ADA and Turner to Mr. Maday's Claims ....................... 91

a.      Individual with a Disability ............................................... 91

b.      Qualified for the Benefit in Question ......................... 102

c.      Denied the Benefit Based upon Disability Discrimination .......... 102

d.      Reasonable Accommodation/Undue Burden ............................. 103

i.      Recreation ............................................................ 103

ii.     Diabetic Diet......................................................... 106

iii.    Diabetic Shoes and Socks ...................................... 109

iv.     Mobility-Impaired Showers, Lay-In Trays, Etc. ........................ 110

4.      Injunctive Relief & October 23, 2018 Settlement Agreement............. 111

I.      Motion to Strike—Docket No. 155 ...................................................... 114

J.      Motion for Discovery and for Appointment of Counsel ......................... 120

K.      Motion to Amend Complaint .............................................................. 128

L.      Motions for Sanctions by Both Parties................................................. 132

CONCLUSION ................................................................................................ 132

NOTICE TO PARTIES ................................................................................... 133

iv

## INTRODUCTION

This matter is before the court on the *pro se* complaint and supplemental complaint of Stanley Maday, a Wisconsin prisoner who is in custody at a South Dakota state penitentiary, the Mike Durfee State Prison ("MDSP"), pursuant to an agreement between the states of South Dakota and Wisconsin.[1]  See Docket Nos. 1 & 94.  Mr. Maday asserts claims arising under 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12165.  Id.

Now pending are motions for summary judgment by the twenty-five (25) South Dakota defendants [Docket No. 125] and the three (3) Wisconsin defendants [Docket No. 145].  These matters have been referred to this magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, United States District Judge.

## FACTS

### A.    Maday's Complaint and Supplement—Docket Nos. 1 & 94

Mr. Maday asserts 19 enumerated claims in his original complaint and 17 enumerated claims (also numbered 1-17), in his supplement.  See Docket Nos. 1 & 94.  There are 28 defendants remaining, 3 from Wisconsin and 25 in South Dakota.  There is some overlap between the two complaints and, in

---

[1] Prior to his conviction of felony sex crimes against minors in state court in Wisconsin, Mr. Maday was a corrections officer in the Wisconsin state prison system.  Wisconsin believed it was in Mr. Maday's best interests not to incarcerate him in the same prison system in which he had been a corrections officer.

1

addition, some of the claims and defendants from the supplemental complaint have been dismissed.[2]  Reading the two documents together, the court ascertains that the following claims are still presented:

**Deliberate Indifference to Serious Medical Needs**

1.    Delaying in the provision of, and failing to assist Mr. Maday in obtaining, properly fitting footwear from August, 2013, to December, 2014 (Docket No. 1, pp. 7-11, 35, claims 1 & 3).

2.    Application of a South Dakota Department of Corrections (DOC) policy letting non-medical personnel determine appropriate footwear for inmates (Docket No. 1, pp. 7-11, 35, claim 2).

3.    Failure to treat a fracture in Mr. Maday's foot  for 9 days from November 11-20, 2015 (Docket No. 1, p. 36, claim 4; Docket No. 94, p. 15, claims 1 & 2).

4.    Failure to treat Mr. Maday's plantar fasciitis from July 27, 2015, to November 11, 2015, which led to a fracture in Mr. Maday's foot which was verified November 11, 2015 (Docket No. 1, pp. 12-16, 36-37, claim 5).

5.    Removal of medically-prescribed arch supports from Mr. Maday's shoes for 13 days between March 25, 2016, and April 7, 2016 (Docket No. 1, pp. 37-38, claims 6 & 7; Docket No. 94 at p. 4).

6.    Failure to properly treat Mr. Maday's foot fracture in August, 2016, by merely prescribing ankle exercises and referring Mr. Maday to Dr. Brad Adams (Docket No. 1, p. 38-39, claim 8; Docket No. 94 at p. 6).

7.    Failure to provide properly fitting diabetic socks in June, 2016, to  (Docket No. 94 at pp. 4-5, 15-16, claims 3 & 4).

---

[2] Claims 5, 6, 7, & 9 from the supplemental complaint were dismissed.  <u>See</u> Docket No. 108.  Also, the following defendants have been dismissed:  Dr. Brad Adams, CBM Food Services and their employees, Stephanie Hamilton, Tiffany Voigt, Diane Romkema, Global Tel & Link Corporation and its employees, Lexis-Nexis and its employees.  <u>See</u> Docket Nos. 108, 112 & 113.

**First Amendment**[3]

8.   Deprivation of a Sports Illustrated magazine in February, 2015, on the grounds the magazine contained nudity (Docket No. 1 at p. 40, claim 10).

9.   Deprivation of a Sports Illustrated swimsuit edition in February, 2016, on the grounds the magazine contained sexually explicit material (Docket No. 1 at p. 40, claim 11).

10.   Deprivation of a hardcover book in November, 2016, and again in March, 2018, where hardcover Bibles and Qurans are allowed (Docket No. 1 at pp. 40-41, claim 12; Docket No. 94 at p. 8).

11.   Deprivation of a letter and its contents on March 13, 2018, because it contained contraband (colored paper) (Docket No. 94 at pp. 7-8).

12.   Deprivation of a letter in April, 2018, from Mr. Maday's brother because it contained contraband without following proper procedure (Docket No. 94 at p. 8)

**Denial of Access to the Courts**

13.   Denial of access to Wisconsin law so that Mr. Maday could not file a petition for habeas relief in Wisconsin state court (Docket No. 1 at p. 41, claim 13).

14.   Denial of access to the courts by eliminating the contract attorney in October, 2017, and eliminating the law library and substituting tablets with access to Lexis/Nexis legal materials in place of the attorney and library (Docket No. 1 at p. 44, claim 19; Docket No. 94 at p. 18).

**Retaliation**

15.   In response to Mr. Maday filing grievances and complaints, he has been retaliated against by having false disciplinary charges filed against him, being locked up in the Special Housing Unit ("SHU") for less than a day on April 27, 2018,

---

[3] Mr. Maday's complaints identify these claims as "unnecessary and arbitrary censorship." See Docket No. 1 at p. 39, Docket No. 94 at p. 17.

and by having his personal property (arch supports) taken from him for approximately 2 weeks (Docket No. 1 at pp. 42-43, claims 14 & 15; Docket No. 94 at pp. 12, 19).

16. In response to Mr. Maday filing grievances and complaints, he has been retaliated against by having his mail interfered with by denying him access to a hardcover book and by censoring his mail in March and April, 2018 (Docket No. 94 at pp. 10-11, 18-19).

**Americans With Disabilities Act (ADA)**

17. Mr. Maday alleges he is disabled and that his rights under the ADA have been violated by the provision only of heart-healthy trays or bland trays when defendants should be providing him a specialized diet for diabetics (Docket No. 1 at p. 43, claim 16; Docket No. 94 at p. 20).

18. Mr. Maday is unable to use the recreation yard because the surface of the yard is broken and uneven and because of when blood draws are scheduled for diabetic inmates (Docket No. 1 at p. 43, claim 17).

19. Inmates who are mobility-impaired are entitled to a handicap shower and to receiving their meals on their units (Docket No. 1 at pp. 43-44, claim 17).

20. Mr. Maday has never been given proper-fitting diabetic socks and the footwear he has been given are inferior because they do not last for one year (Docket No. 1 at p. 44, claim 18; Docket No. 94 at pp. 4-5).

**Remedies Requested:**

A. Appoint a special master to oversee all prison operations.

B. Enter an order withholding all federal funding for all South Dakota state penitentiaries until they comply with the ADA.

C. Issue a number of very specific injunctions on a variety of topics.

D. Nominal, compensatory and punitive damages and costs.

E.   Issue a declaration that each defendant has violated Mr. Maday's constitutional rights and his rights under the ADA.

**B.   Defendants' Statement of Undisputed Material Facts and Mr. Maday's Response**

Defendants' statement of undisputed material facts is unnecessarily unwieldy, repetitive, lengthy, and disorganized.  <u>See</u> Docket No. 140.  It consists of 71 pages and 273 numbered paragraphs.  Many of those paragraphs simply parrot back verbatim lengthy quotations from Mr. Maday's complaints.  In addition, the paragraphs in the statement of undisputed facts are identical to the paragraphs in the various affidavits filed by defendants in support of their summary judgment motions.

Nor are Mr. Maday's responses helpful.  For example, paragraphs 3-7 & 13 in defendants' statement of facts merely set forth verbatim quotations of Mr. Maday's *own* allegations from his *own* complaint.  <u>See</u> Docket No. 140 at pp. 4-5, ¶¶ 3-7; p. 7, ¶13.  If there was anything in the defendants' statement of facts that should elicit an unqualified admission from Mr. Maday, it should be these paragraphs that were are taken verbatim from Mr. Maday's complaints.  No.  Instead, Mr. Maday does not unqualifiedly admit that these are his assertions, even though they are quoted directly from his complaint. He engages in lengthy argument about each, adding nothing new.  <u>See</u> Docket No. 172 at pp. 1-3, ¶¶3-7; pp. 3-4, ¶13.

Because the paragraphs in defendants' statement of undisputed facts are drawn verbatim from paragraphs in the underlying supporting affidavits, the court cites in this opinion to the source documents themselves—the affidavits.

Likewise, the court refers to Mr. Maday's 105-page affidavit in discerning disputes of fact.  See Docket No. 174.  For reference, the reader is informed that, although the first three pages of Mr. Maday's affidavit are written without paragraph numbers, later he adopts paragraph numbers and these numbers correspond to the numbered paragraphs in defendants' statement of undisputed facts.

Finally, the court also relies on the source documents provided by defendants and Mr. Maday as exhibits.    See Docket No. 126-1 through 126-126; Docket No. 173-1 (SJ Exhibits 1-81).  These exhibits consist of reproductions of defendants' policies, copies of documents submitted by both parties in resolving administrative grievances, and medical records from Mr. Maday's prison medical records.  Id.  The court finds this approach the most expedient because, in any event, each party must support their assertions of fact with affidavits or other documentation.  See FED. R. CIV. P. 56(c).

The movant's statement of undisputed material facts and the non-movant's response to that statement are intended to narrow the issues for the court.  Where, as here, they do not do so, the court refers directly to the parties' affidavits and other exhibits.   The detailed facts are discussed below in conjunction with the legal analysis of each claim rather than set forth separately here in omnibus fashion.

## DISCUSSION

### A.  Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam).  Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).  Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Anderson, 477 U.S. at 256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

7

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment. Anderson, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2725, at 93–95 (3d ed. 1983)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented: "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

Though pro se litigants like Mr. Maday are entitled to a liberal construction of their pleadings, FED. R. CIV. P. 56 remains equally applicable to them. Quam v. Minnehaha Co. Jail, 821 F.2d 522, 522 (8th Cir. 1987). The district court is not required to "plumb the record in order to find a genuine issue of material fact." Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996). Courts must remain sensitive, however, "to the special problems faced by prisoners attempting to proceed pro se in vindicating their

8

constitutional rights, and [the Eight Circuit does] not approve summary dismissal of such *pro se* claims without regard for these special problems." Nickens v. White, 622 F.2d 967, 971 (8th Cir. 1980). "When dealing with summary judgment procedures the technical rigor is inappropriate where . . . uninformed prisoners are involved." Ross v. Franzen, 777 F.2d 1216, 1219 (7th Cir. 1985).

**B.      The Law of Qualified Immunity**

In order to show a *prima facie* case under 42 U.S.C. § 1983, Mr. Maday must show (1) defendants acted under color of state law and (2) " 'the alleged wrongful conduct deprived him of a constitutionally protected federal right.' " Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010) (quoting Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009)).

Qualified immunity protects government officials from liability and from having to defend themselves in a civil suit if the conduct of the officials "does not violate clearly established statutory or constitutional rights." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is immunity from suit, not just a defense to liability at trial. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). Therefore, the Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991).

To determine whether an official may partake of qualified immunity, two factors must be determined: (1) whether the facts that plaintiff has shown make out a violation of a constitutional right and (2) whether that

constitutional right was "clearly established" at the time of the official's acts.
Saucier v. Katz, 533 U.S. 194, 201 (2001).  If the court finds that one of the two
elements is not met, the court need not decide the other element, and the court
may address the elements in any order it wishes "in light of the circumstances
of the particular case at hand."  Pearson v. Callahan, 555 U.S. 223, 236 (2009).
Defendants are entitled to qualified immunity if the answer to either of the
Saucier prongs is "no."

The question of whether a constitutional right was clearly established
may not be formulated at a "high level of generality."  Mullenix v. Luna, 577
U.S. ___, 136 S. Ct. 305, 308 (2015).  Rather, the Court requires that the
inquiry be based on the specific context of the case, not a broad general
proposition.  Id.  The Court has made clear there must be a case nearly
factually squarely on point decided by the Supreme Court before a
constitutional right can be considered "clearly established."  Id. at 308-09.  For
example, whether a plaintiff's right to be free from excessive force was clearly
established under the law is not the appropriate inquiry.  Id.  Instead, the court
must ask whether the right to be free from lethal force was clearly established
in the context of a fleeing disturbed felon in the immediate area of persons to
whom a risk of harm is posed by the felon's flight.  Id. at 309 (discussing
Tennessee v. Garner, 471 U.S. 1 (1985)).

"Qualified immunity gives government officials breathing room to make
reasonable but mistaken judgments," and "protects 'all but the plainly
incompetent or those who knowingly violate the law.' "  Stanton v. Sims, 571

10

U.S. 3, 5-6 (2013) (cleaned up).  " 'We do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.' " Stanton, 571 U.S. at 5.  " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' " Ambrose v. Young, 474 F.3d 1070, 1077 (8th Cir. 2007) (quoting Hunter, 502 U.S. at 229).

The Supreme Court has stated that "if the defendant does plead the [qualified] immunity defense, the district court should resolve that threshold question before permitting discovery." Crawford-El v. Britton, 523 U.S. 574, 598 (1998) (citing Harlow, 457 U.S. at 818).  The Court held that a "firm application of the Federal Rules of Civil Procedure is fully warranted and may lead to the prompt disposition of insubstantial claims." Id. at 597 (cleaned up).

Only if the plaintiff's claims survive a dispositive motion on the issue of qualified immunity will the plaintiff "be entitled to some discovery." Crawford-El, 523 U.S. at 598.  Even then, the Court has pointed out that FED. R. CIV. P. 26 "vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." Id.  Such discretion includes the ability to establish limits on the number of depositions and interrogatories, to limit the length of depositions, to limit the number of requests to admit, to bar discovery on certain subjects, and to limit the time, place, and manner of discovery as well as its timing and sequence.  Id.

The party asserting qualified immunity has the burden to establish all the predicate facts supporting a grant of immunity. Winslow v. Smith, 696

11

F.3d 716, 730 (8th Cir. 2012). When immunity is asserted in a summary judgment motion, all reasonable inferences from the facts are given in benefit of the nonmoving party. Id.

The qualified immunity defense applies only to the individual capacity claims against defendants for money damages; it does not affect plaintiff's official capacity claims for declaratory and injunctive relief. Pearson, 555 U.S. at 242-43 (2009); Hafer v. Melo, 502 U.S. 21, 25 (1991); Grantham v. Trickey, 21 F.3d 289, 295 (8th Cir. 1994).

**C.    Statute of Limitations**

In support of their summary judgment motion, defendants assert Mr. Maday's claim that defendants failed to provide him with proper fitting shoes is barred by the applicable three-year statute of limitations for § 1983 claims. There is no federal statute of limitations for actions brought under 42 U.S.C. § 1983, so courts are directed to adopt a local statute of limitations for analogous causes of action "if not inconsistent with federal law or policy to do so." See Wilson v. Garcia, 471 U.S. 261, 266-67 (1985). The Wilson Court held that, for § 1983 actions, the most analogous state limitations period was the limitations period applicable to personal injury actions. Id. at 280.

Wilson was partially superseded by passage of a "catch-all" statute of limitations for federal actions. See 28 U.S.C. § 1658, as recognized in Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 377-81 (2004). If a plaintiff's claim "arises under" a federal statute that was enacted by Congress after 1990, then a four-year statute of limitations applies. See 28 U.S.C. § 1658. Although

§ 1983 was amended after 1990 (in 1996), those amendments have to do with immunity for judicial officers from injunctive relief. <u>See</u> 42 U.S.C. § 1983. Thus, actions such as Mr. Maday's claim do not "arise under" the 1996 amendments. <u>See</u> <u>Williams v. Hawkeye Community College</u>, 494 F. Supp. 2d 1032, 1038 (N.D. Iowa 2007). Accordingly, <u>Wilson</u> continues to control the analysis. <u>DeVries v. Driesen</u>, 766 F.3d 922, 923-24 (8th Cir. 2014); <u>Williams</u>, 494 F. Supp. 2d at 1038.

South Dakota enacted a specific three-year statute of limitations for federal civil rights actions. <u>See</u> SDCL § 15-2-15.2. The state's limitations period for personal injury actions is identical: three years. <u>See</u> SDCL § 15-2-14(3). So, applying either statute, Mr. Maday had three years "after the alleged constitution deprivation has occurred" to bring suit. <u>See</u> SDCL § 15-2-15.2. In order to apply the statute, the court must first determine (1) when Mr. Maday's claim accrued and (2) whether the limitations period should be tolled.

Mr. Maday alleges in his complaint that he was denied properly fitting shoes beginning when he arrived in South Dakota's prison system in August, 2013. Defendants seize on the 2013 date in support of their summary judgment motion. But Mr. Maday alleges this supposedly unconstitutional condition lasted until December 18, 2014, when medical staff finally issued an order that he would benefit from New Balance® shoes. He alleges approximately six weeks later, he received such shoes. Thus, he appears to have received shoes satisfactory to him sometime in January or

13

February, 2015.  Mr. Maday filed his complaint with this court on December 8, 2017, less than three years afterward.  See Docket No. 1.

A § 1983 action accrues "when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." Wallace v. Kato, 549 U.S. 384, 394 (2007) (cleaned up).  Deliberate indifference claims are not subject to the doctrine of continuing tort.  See Haltom v. Parks, 2018 WL 1033488 at *3 (D. Neb. Feb. 21, 2018); Parker v. Webber, 2014 WL 1057189 at *5 n.3 (M.D. La. Mar. 19, 2014) (citing Nottingham v. Richardson, 499 Fed. Appx. 368, 375 (5th Cir. 2012)).  The question of when a § 1983 claim accrues is a federal question.  Montin v. Estate of Johnson, 636 F.3d 409, 413 (8th Cir. 2011).  Because the continuing tort doctrine emanates from state law, the continuing tort doctrine does not apply in the § 1983 context to determine when a claim accrued.  Nottingham, 499 Fed. Appx. at 375; Haltom, 2018 WL 1033488 at *3.

However, before Mr. Maday had "a complete and present cause of action," his medical need had to be sufficiently serious to meet the definition of deliberate indifference (discussed in more detail below).  Coleman v. Rahja, 114 F.3d 778, 784 (8th Cir. 1997).  The court finds, viewing the facts in the light most favorable to Mr. Maday, he first knew he had a sufficiently serious medical need on December 18, 2014, when medical staff at the prison discovered he had an abscess under one of his calluses on his feet.  If that is the date of accrual, then Mr. Maday's claim was timely filed.  He would have had until December 18, 2017, to assert this claim within the three-year statute

14

of limitations for § 1983 actions.  He did so by filing his complaint December 8, 2017.

This court recommends denying defendants' summary judgment motion on the basis of untimeliness.  However, if this case proceeds to trial, this motion may be renewed at trial if facts are established indicating Mr. Maday had a sufficiently serious medical condition such that his deliberate indifference claim accrued prior to December 8, 2014.

**D.    Deliberate Indifference to Serious Medical Needs**

**1.    The Standard for Evaluating Deliberate Indifference Claims**

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment.  Allard v. Baldwin, 779 F.3d 768, 771 (8th Cir. 2015).  That prohibition includes prison officials' deliberate indifference to the medical needs of inmates.  Id.  That is because "deliberate indifference to serious medical needs of prisoners constitutes 'the unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."  Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)).  "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  Id. at 104-05.

"[T]his does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment."  Id. at 105.  "[A] prisoner must allege acts or omissions

15

sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. at 106.  Allegations of negligence and even gross negligence are not enough to state a claim.  Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) (prisoner must show more than gross negligence and more than disagreement with treatment decisions).

Deliberate indifference requires the court to make both an objective and a subjective evaluation.  Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing Coleman, 114 F.3d at 784).  Mr. Maday is required to show (1) that he suffered objectively serious medical needs and (2) that defendants actually knew of but deliberately disregarded those needs.  Id. (citing Coleman, 114 F.3d at 784).  "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Coleman, 114 F.3d at 784.

To establish liability, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994). A plaintiff asserting deliberate indifference "must show more than even gross negligence"—he "must establish a 'mental state akin to criminal recklessness: disregarding a known risk to the inmate's health.' "  Allard, 779 F.3d at 771-72.  A plaintiff can show deliberate indifference by demonstrating grossly incompetent or inadequate care; showing a defendant's decision to make a less

16

efficacious and easier course of treatment; or demonstrating that a defendant denied access to or intentionally delayed medical care. Id. at 772.

### 2.    Lack of Properly Fitting Shoes

Mr. Maday appears to have been issued his first pair of prison shoes at the South Dakota State Penitentiary in Sioux Falls and then he was transferred to the Mike Durfee State Prison (MDSP) in Springfield, South Dakota. Once he arrived there, he claims he began to develop painful calluses and an abscess under his toenail. These conditions, he alleges, were caused by ill-fitting shoes.

Mr. Maday asserts he complained about his shoes and was directed to defendant Muriel Namminga in the laundry department at MDSP. Ms. Namminga agreed with Mr. Maday and told him he should have been fitted with wide shoes at the Sioux Falls facility. She ordered wide leather shoes with Velcro closures and gave them to Mr. Maday sometime prior to September, 2013. Between September, 2013, and November, 2014, prison staff gave Mr. Maday a total of three pairs of wide shoes, attempting to accommodate his needs. See Docket No. 1 at p. 9.

During sick call visits to prison medical staff during this time, Mr. Maday continued to complain that his new shoes were also ill-fitting and he requested New Balance shoes which he admired on other inmates' feet. Mr. Maday alleges he was given the run-around between unit staff (non-medical) and medical staff, with each group of personnel telling Mr. Maday the other group had to authorize the shoes. He was seen a number of times by medical staff

17

during this time.  Besides attempting to fit Mr. Maday with appropriate shoes, medical staff also gave him moleskin to attempt to protect his feet and prevent further callus formation and a pumice stone to help reduce calluses.  See Docket No. 174 at pp. 32, 34 (Maday affidavit).  Mr. Maday admits the moleskin was at least partially effective.  Id. at p. 34.

On December 18, 2014, after Mr. Maday developed an infected ulcer under one of his calluses, medical staff finally issued an order for better fitting shoes.  Unit staff then ordered New Balance shoes for Mr. Maday.  The shoes arrived approximately six weeks later.

The facts alleged by Mr. Maday, taken as true, do not show deliberate indifference.  Viewing the facts in the light most favorable to Mr. Maday, he went approximately 18 months without diabetic shoes as an inmate in South Dakota prisons.  This court has previously held that a delay in providing diabetic shoes of three and a half years *after* a medical order for diabetic shoes were issued did not constitute deliberate indifference.  See Gard v. Dooley, 4:14-cv-04023-LLP, Docket No. 134 at pp. 65-67; Docket No. 149 (D.S.D. Mar. 4, 2016, and Sept. 26, 2016).  Here, no order for diabetic shoes was issued until December 18, 2014, and the shoes were then provided within six weeks.

When Mr. Maday complained of ill-fitting shoes from the Sioux Falls prison, his feet were measured and new, wider shoes were ordered for him. Apparently trying to address Mr. Maday's continued complaints, a total of three pairs of wider shoes were ordered for him over the course of a year.  Moleskin and a pumice stone were given to him after he developed calluses.  Throughout

18

this time, Mr. Maday continued to have access to medical care.  When one of his calluses on his foot developed an abscess discovered on December 18, 2014, defendants ordered the New Balance shoes Mr. Maday wanted.

The record reflects that, at every turn, defendants attempted to address Mr. Maday's complaints.  They did not give him New Balance shoes right away, but he did not have the right to dictate his own treatment.  See Jolly, 205 F.3d at 1096 (a mere disagreement with treatment does not constitute deliberate indifference).  The steps defendants did take—measuring Mr. Maday's feet, ordering first one pair, then a second, and finally a third pair of shoes for him, giving him moleskin and a pumice stone—does not show "a 'mental state akin to criminal recklessness:  disregarding a known risk to the inmate's health.' " Allard, 779 F.3d at 771-72.

"To be liable for deliberate indifference, a defendant must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837.  To prevail on his deliberate indifference claim, Mr. Maday must show (1) the named defendants were aware that the three pairs of wide shoes ordered for him during his first 18 months in South Dakota prisons could cause a substantial risk of serious harm to Mr. Maday; and (2) the named defendants drew the inference that a serious risk of harm existed because Mr. Maday had three pairs of shoes for 18 months that were not New Balance shoes. Mr. Maday has not made this showing.

19

First, no nonmedical named defendant was personally aware Mr. Maday needed diabetic shoes.  Mr. Maday admits as much in his response in opposition regarding defendant Muriel Namminga in which he states, "It is not clear that Defendant Namminga was not aware that Plaintiff needed New Balance shoes."  See Docket No. 174 at p. 28 (Maday Affidavit).  Medical staff did not prescribe diabetic shoes for Mr. Maday until after December 18, 2014.  Those shoes were then provided by nonmedical staff within 6 weeks.  Six weeks is not unreasonable given Mr. Maday's representation that he has extremely unusually sized feet and the shoes almost certainly had to be special-ordered.  Id. (asserting his feet are size 12EEEE).  This does not constitute deliberate indifference by nonmedical staff.

As to medical staff, they were aware Mr. Maday complained about his shoes, but he was provided a series of three (actually four counting his first pair) different pairs of shoes to try over the course of 18 months.  It was not until Mr. Maday developed an abscess under one of his calluses that medical staff ordered diabetic shoes.  That is not enough to prevail on a claim for deliberate indifference to a serious medical need.  Allard, 779 F.3d at 771-72.  "Without any evidence that [the defendant] 'actually knew' [the plaintiff] experienced serious side effects . . . or that [they] deliberately disregarded such a risk, [they] did not violate his Eighth Amendment rights."  Laganiere v. County of Olmstead, 772 F.3d 1114, 1117 (8th Cir. 2014) (citing McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009)).

Here, there is insufficient evidence that any one of the named defendants, medical or nonmedical, actually realized Mr. Maday required a medical order for diabetic shoes until December 18, 2014. Once that need became evident, defendants acted with dispatch.

"[D]eliberate indifference depends on the mental state of the defendants." Williams v. Boozer, 526 Fed. Appx. 668, 670-71 (7th Cir. April 16, 2013). In Williams, the inmate plaintiff sued two prison guards for deliberate indifference because he claimed they forced him to wear work boots against his doctor's orders. The inmate was diabetic and had a medical order to refrain from wearing the work boots. Despite the inmate's claim he believed he had to wear the boots because of his job as a prison porter, the guards testified they did not force him to work. Id. at 670. They further testified they were unaware of the health risk the boots presented to the inmate. Id. The Seventh Circuit affirmed judgment in favor of the guards because "guards who are unaware of a risk cannot be deliberately indifferent to it." Id. at 671.

When an inmate alleges that a delay is the constitutional deprivation, the objective seriousness of the deprivation is measured by reference to the effect of the delay. Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997). In addition to showing the defendants knew he went without diabetic shoes for 18 months, therefore, Mr. Maday must also show the effect of the delay in receiving the shoes. See Acrey v. Zestos, 2014 WL 4410151 (E.D. Mich., Sept. 8, 2014). In Acrey, the plaintiff inmate sued a prison physician and administrator for deliberate indifference for delay in receiving diabetic soft

21

shoes.  Id. at * 5.   The plaintiff had previously been diagnosed with diabetes and neuropathy, but the prison physician did not believe he needed special shoes.  Id.  The court found no deliberate indifference because "during the entire time  . . .none of the symptoms of neuropathy were either reported by plaintiff or found to exist when examined by medical staff.  Plaintiff received regular and frequent medical attention, he never reported any actual foot problems during those sessions, and examinations of his feet consistently found that his feet were normal and that his sensations in his feet were intact bilaterally."  Id. at 6.

In  Askew v. Davis, 613 Fed. Appx. 544 (7th Cir. 2015) the inmate plaintiff likewise claimed deliberate indifference for failure to timely provide diabetic shoes.  In Askew, the inmate plaintiff sued the warden and prison medical staff because it took a year before he received the diabetic shoes he requested upon arrival in prison.  Id. at 545.  The inmate alleged that during the year delay, he experienced pain, numbness and swelling in his feet.  Id. at 546.  The court affirmed summary judgment in favor of the defendants because "even if [plaintiff] was in pain from diabetic neuropathy when he first requested the shoes, nothing in the record suggests that his shoes were the cause."  Id. at 547.  See also, Matthews v. Pallito, 2014 WL 4805333 at * 12 ("Matthews had not shown that any delay in receiving diabetic shoes caused the harm that he complains of.") (citing cases) (D. Ver. Sept. 26, 2014).

As to Mr. Maday's diabetic shoe claim, the record before the court does not support a finding that any defendant was subjectively aware there was an

excessive risk to Mr. Maday's health followed by a failure to act on that knowledge prior to December 18, 2014.  Coleman, 114 F.3d at 785.  As such, Mr. Maday has not established his claim for deliberate indifference.  The defendants' summary judgment motion for qualified immunity on this claim should be granted because  defendants were not "plainly incompetent" with regard to Mr. Maday's Eighth Amendment rights.  Hunter, 502 U.S. at 229.

### 3.    Allowing Non-medical Staff to Decide Proper Footwear

Mr. Maday alleges in his complaint that defendants have a policy allowing nonmedical staff to determine what proper footwear for an inmate is. He alleges this policy, in and of itself, constitutes deliberate indifference.  In his response in opposition to summary judgment, he provides the court with a policy.  See Docket No. 173-1 at p. 26.  This policy establishes only that medical staff will not provide or prescribe comfort items for non-medical issues. Id.  Special shoes fall into the category of comfort items where they are not required for a medical issue.  Id.

Mr. Maday also points to defendants' exhibit 27 as proof the defendants vest nonmedical personnel with the power to give out diabetic shoes.  The document Mr. Maday relies upon is a list of current medical orders for Mr. Maday.  See Docket No. 126-27.  Although moleskin and diabetic socks are on the list, diabetic shoes are not on the list.  Id.  But this omission is irrelevant where Mr. Maday admits he received New Balance shoes appropriate for his diabetic feet approximately six weeks after his ulcerated callus was

discovered.  See Docket No. 174 at p. 36, ¶ 51.  The defendants' exhibit does *not* prove that defendants allow nonmedical staff to determine medical issues.

Mr. Maday alleges contrary facts in his complaint.  Specifically, he alleges he was repeatedly told by nonmedical staff that he had to be approved for diabetic shoes by medical staff.  See Docket No. 1 at p. 8, ¶ 46; p. 9, ¶ 49; p. 10, ¶ 55.  Moreover, defendants have asserted and supported their assertion with affidavits establishing that the policy is that diabetic shoes are to be prescribed by medical staff.  See Docket No. 138 at p. 5, ¶ 9 (Dr. Mary Carpenter affidavit); Docket No. 132 at p. 6, ¶ 10 (Michael Hanvey affidavit); and Docket No. 130 at p. 6, ¶ 14 (Joshua Klimek affidavit).

Finally, the sequence of events Mr. Maday asserts bears out defendants' assertions as to official policy.  Once medical staff prescribed diabetic shoes for Mr. Maday, nonmedical staff measured his feet, ordered the shoes, and delivered them to Mr. Maday, thus indicating the impetus for the diabetic shoes originated with medical staff.  This court recommends granting defendants' summary judgment motion on the claim of an official policy of letting nonmedical staff determine when diabetic shoes are warranted.

### 4.    Failure to Treat Mr. Maday's Plantar Fasciitis

Mr. Maday alleges he began to develop what he thought was plantar fasciitis in the spring of 2015 when he began walking laps in the recreation yard.  On July 27, 2015, he asserts he reported pain in his heel to prison medical staff, a complaint he reiterated periodically until November 10, 2015, at which time he was discovered to have a stress fracture in a bone in his foot.

He claims the failure to treat his alleged plantar fasciitis from July through November, 2015, contributed to the stress fracture and constituted deliberate indifference.

Defendants deny this sequence of events. Reviewing Mr. Maday's prison medical records, defendants have asserted by affidavit that Mr. Maday saw prison medical staff on July 27 and never complained of foot or heel pain. See Docket No. 126-78. Defendants state Mr. Maday saw medical staff again on July 28, and again failed to describe any foot or heel pain. See Docket No. 126-79. Defendants state Mr. Maday saw prison medical staff on September 11, 2015, and again never complained of pain in his foot or heel— his complaint that day was his left great toenail. See Docket No. 126-80. Defendants assert Mr. Maday first complained of heel pain on October 14, 2015, and told prison medical staff the pain had been ongoing for several weeks. See Docket No. 126-81. In response to his complaints, prison medical staff prescribed arch supports and stretching to address his heel pain. Id. X-rays were also ordered that day to explore the source of his right heel pain. Id. Those x-rays showed no fracture or dislocation, though they did show significant degenerative changes. See Docket No. 126-82.

At Mr. Maday's next medical visit on November 6, 2015, he reported to prison medical staff that his heel pain was improving, though he now had swelling on the top of his right foot near the toes. See Docket No. 126-83. He had been allowed to receive "lay in with meals to the unit" (meaning he did not have to walk anywhere to eat) for a couple days prior to the medical visit. Id.

25

Staff believed the swelling was from Mr. Maday attempting to avoid placing any weight on his right heel or his left big toe, which had recently had the toenail removed.  Id.  Accordingly, staff prescribed "lay in with meals" through November 9 and acetaminophen four times a day for a week.  Id.

Assuming plantar fasciitis is a serious medical condition within the meaning of the Eighth Amendment, defendants' course of action is far from deliberately indifferent.  Mr. Maday never made medical staff aware of his heel pain until October 14, 2015.  See Docket No. 126-81.  When defendants learned of this complaint, they prescribed arch supports, gave Mr. Maday stretching exercises to do, and x-rayed his heel.  Id.  They prescribed rest and acetaminophen.  See Docket No. 126-83.  This is far from the kind of criminal recklessness Mr. Maday is required to show in order to make out a deliberate indifference claim.    Allard, 779 F.3d at 771-72.  The court recommends granting defendants' summary judgment on Mr. Maday's deliberate indifference claim premised on failure to treat his plantar fasciitis.

### 5.    Failure to Treat a Fracture in Mr. Maday's Foot for 9 Days

Mr. Maday alleges he reported to prison medical staff on November 4, 5, 6, 9, and 10, 2015,[4] complaining each day of severe pain in his right foot.  The 7th and 8th of November, 2015, fell on a Saturday and Sunday, during which no sick calls are available at MDSP.  Mr. Maday alleges no action was taken on

---

[4] Defendants supplied no medical record from November 9, 2015, but Mr. Maday did.  See Docket No. 173-1 at p. 75.  The record for November 6, 2015, was discussed, *supra*, in the court's discussion of Mr. Maday's plantar fasciitis claim.

any visit from the 4th through the 9th.  On the 10th, he was told he would be scheduled to see a provider later that day.

He then saw Dr. Stephen Schroeder at 3 p.m. on the 10th and Dr. Schroeder ordered an X-ray be taken.  <u>See</u> Docket No. 126-84.  That X-ray was read by a radiologist on November 11, 2015, and a fracture was diagnosed in Mr. Maday's right fourth metatarsal without significant displacement.  <u>See</u> Docket No. 126-85.  Mr. Maday alleges defendants knew of the radiologist's conclusions the same day—the 11th—but did not call Mr. Maday to come back to the sick bay until November 13.  Apparently, at that point, Mr. Maday received medical care he deemed acceptable.

Defendants' medical records indicate they told Mr. Maday about the fracture of his fourth metatarsal.  <u>Id.</u>  He was prescribed a cam walker boot and no weightbearing.  <u>Id.</u>  Mr. Maday was provided with crutches and allowed to receive his meals in his unit.  <u>Id.</u>  A wheelchair was prescribed for long distances.  <u>Id.</u>  Tylenol® was prescribed four times per day for 30 days.  <u>Id.</u>  Follow-up was planned based on any recommendations from podiatry.  <u>Id.</u>  Mr. Maday admits defendants provided these responses to his fractured metatarsal.  <u>See</u> Docket No. 174 at p. 58.

On November 25, 2015, Mr. Maday was seen by an outside podiatrist, Dr. Terrence Pedersen.  <u>See</u> Docket No. 126-55.  Dr. Pedersen issued Mr. Maday special orthotics to be used in combination with a walking boot.  <u>Id.</u>  Dr. Pedersen saw Mr. Maday for a follow-up visit on December 8, 2015.  <u>See</u> Docket No. 126-56.  Mr. Maday reported his foot felt much better and it no

27

longer hurt to walk on it.  Id.  At another follow-up visit on January 5, 2016, Dr. Pedersen concluded Mr. Maday's fracture had healed.  See Docket No. 126-57.  Dr. Pedersen instructed Mr. Maday to wear the walking boot one-half day per day for a week and then transition back to his regular shoes.  Id.

Mr. Maday's allegations do not match up with his medical records.  He did see prison medical staff on November 6, but gave a mixed report.  Although he reported his heel pain was better, he reported a new source of pain and swelling on the top of his right foot near the toes.  See Docket No. 126-83.  Defendants prescribed rest and pain relievers, entering an order for lay in for several days.  Id.  The next medical visit in Mr. Maday's medical records is November 10.  See Docket No. 126-84.  On that date, x-rays were ordered to be taken.  Id.  The images were taken on the 10th, read by a radiologist on the 11th.  Therefore, the "delay" in treating Mr. Maday's metatarsal fracture was two days—from the 11th when a radiologist diagnosed the fracture until the 13th when Mr. Maday was recalled to the sick bay.

Two days' delay for treating a metatarsal fracture is simply not, as a matter of law, deliberate indifference.  Even if it somehow could be said to be deliberate indifference, it is Mr. Maday's burden to show the effect of the delay.  Crowley, 109 F.3d at 502.  In addition to showing the defendants knew he went without treatment for his metatarsal fracture for 2 days, therefore, Mr. Maday must also show the effect of the delay in receiving treatment.  See Acrey, 2014 WL 4410151.  He has failed to demonstrate that showing.  He was already prescribed a cam boot, crutches, and a wheelchair and allowed to "lay in" for

28

meals.  The treatment prescribed by defendants before the fracture was definitively diagnosed was identical to the treatment once the metatarsal fracture was confirmed.  Mr. Maday never asserts what additional treatment could have or should have been given and how the result would have been any different.

In his affidavit in support of his opposition to summary judgment, Mr. Maday emphasizes that from November 6-13, although he received lay-in trays for meals, he still had to walk significant distances for blood-sugar checks and to receive medications.  See Docket No. 174 at pp. 10-13.  But this cannot be termed deliberate indifference when Mr. Maday admits defendants did not learn he had a broken metatarsal until November 11, defendants provided appropriate medical treatment before learning of his broken metatarsal, and the treatment provided from November 10-13 and beyond was identical and admitted to be appropriate by Mr. Maday.

Mr. Maday cites McAdoo v. Martin, 899 F.3d 521 (8th Cir. 2018), repeatedly in support of his deliberate indifference claim, but the McAdoo case is distinguishable.  In that case, the plaintiff-inmate, McAdoo, sustained a shoulder injury during a corrections officer's take-down after McAdoo refused to quit fighting another inmate.  Id. at 523.  That injury was initially diagnosed as a dislocation and the emergency room doctor prescribed hydrocodone for McAdoo's pain.  Id. at 523-24.  Prison officials did not fill the prescription because all narcotic pain medication was banned in prison by prison policy. Id.  Instead, McAdoo was given non-narcotic pain relievers.  Id.

29

Two days later, jail staff took McAdoo back to the emergency room doctor who discovered a fracture in the humeral head of McAdoo's arm with bony fragments in the anterior glenohumeral.  Id.  Doctors told McAdoo he needed immediate surgery.  Id.  Jail staff asked McAdoo to sign a legal document stating he would be responsible for the cost of his surgery.  Id.  McAdoo refused to sign the document.  Id.  Jail staff then denied McAdoo any further treatment of his shoulder.  Id.  One month later, McAdoo was transferred to another facility where he then received surgery to repair his shoulder.  Id.

The district court in McAdoo's case denied him recovery.  Id. at 524.  The court characterized McAdoo's "serious medical need" as consisting only of pain. Id.  The district court then held that, under the Prison Litigation Reform Act, an inmate could not recover damages unless there was a physical injury.  Id. The Eighth Circuit reversed, noting that McAdoo *did* have a physical injury— the fracture of his humeral head.  Id. at 525-26.  The court held the PLRA did not require that defendants' unconstitutional conduct *caused* the physical injury, just that there *was* a physical injury and a demonstrated deliberate indifference to that injury.  Id.  The court specifically upheld the defendants' denial of hydrocodone to McAdoo "in the midst of an opioid epidemic."  Id. at 527.  However, the Eighth Circuit reversed and remanded for an award of damages based on the differential, if any, between the pain of an untreated shoulder fracture, minus the pain experienced after taking nonnarcotic pain relievers.  Id.

Here, unlike McAdoo, defendants did not delay or refuse treatment for a month once a fracture was confirmed—the delay was only for two days. Furthermore, the treatment provided to Mr. Maday before the fracture was confirmed and afterward was identical. Both before and after the x-ray, he was given nonnarcotic pain relievers, lay-in trays, a cam boot, crutches, and a wheelchair. No defendant conditioned Mr. Maday's receipt of medical care upon his signing a document of any kind. Accordingly, this court recommends defendants be granted summary judgment on Mr. Maday's deliberate indifference claim related to the delay in treating his metatarsal fracture.

### 6.    Removal of Arch Supports for 13 days

Mr. Maday alleges defendant Corporal Dennis Cropper took his arch supports from his cell on March 26, 2016, and he did not receive replacement arch supports until April 7, 2016. See Docket No. 174 pp. 59-60. He alleges Corporal Cropper was deliberately indifferent to his serious medical needs and that Cropper's supervisor, Josh Klimek, was also deliberately indifferent for failing to intervene and correct the problem sooner.

As with other issues where Mr. Maday alleges there was a delay or interruption in his medical treatment, it is Mr. Maday's burden to show the effect of the delay. Crowley, 109 F.3d at 502. In addition to showing the defendants knew he went without his arch support for 13 days, therefore, Mr. Maday must also show the effect of the delay in receiving treatment. See Acrey, 2014 WL 4410151. He has failed to demonstrate that showing.

He asserts in his opposition to summary judgment that he first began experiencing pain at the site of his previous fracture during this time when Cropper took his arch supports.  See Docket No. 174 at p. 55.  Mr. Maday theorizes that the "lack of medically ordered arch supports placed unnecessary stress on Plaintiff's previously fractured fourth metatarsal of his right foot resulting in a refracture of same."  Id.

First, the court notes that Mr. Maday is not an expert in medicine.  Second, the x-rays taken later (discussed immediately below) did not show a "refracture."  See Docket No. 126-60 (no acute fracture, partially healed metatarsal).  Third, the arch supports were removed for 13 days in late March and early April according to Mr. Maday's own account of these events.  Also, by his own account, he first began experiencing pain at the site of his former metatarsal fracture on August 9, 2016.  See Docket No. 174 at pp. 54-55.  There is simply no proof of a causal nexus between Cropper's removal of Mr. Maday's arch supports for 13 days five months before Mr. Maday ever complained of pain at his old fracture site.

Also in support of his position, Mr. Maday submits an x-ray of his right foot taken on January 4, 2016, when doctors proclaimed his foot to be healed.  See Docket No. 173-1 at p. 68.  He compares this to the x-ray taken February 10, 2017, and notes the different appearance of his fourth metatarsal.  See Docket No. 173-1 at p. 69-70.  However, this court, like Mr. Maday, it not an expert in reading x-rays.  And nothing about these documents submitted by Mr. Maday pinpoints the change in his fourth metatarsal to the March/April,

32

2016, time frame when Cropper took his arch supports.[5]  The court recommends granting summary judgment to defendants on this claim.

### 7.    Failure to Properly Treat Foot Fracture in August, 2016

Mr. Maday alleges he suffered a refracture of his foot in August, 2016. He alleges defendants were deliberately indifferent to his serious medical needs because they did not determine he had a fracture, they gave him a handout for ankle exercises he could do on his own, and they referred Mr. Maday to see Dr. Brad Adams.

Mr. Maday's medical records indicate he complained of pain the general vicinity of his previous right foot metatarsal fracture on September 7, 2016, after he had been walking more.  See Docket No. 126-59.  He also complained of pain in the ball of his right foot.  Id.  Examination found no irregularities at the site of the pain, on either the top or bottom of Mr. Maday's right foot.  Id. There was no redness, swelling, or callous.  Id.  Mr. Maday did not exhibit any facial grimace or moaning when his foot was palpated or when he walked.  Id. Mr. Maday was given stretching exercises for his foot and encouraged to try placing ice on it.  Id.  Mr. Maday asserts Dr. Brad Adams told him on this occasion that pain at the site of his healed stress fracture was "normal" or "not unheard of."  See Docket No. 174 at p. 54.

Defendants assert Mr. Maday next reported to sick call on February 4, 2017, some five months later.  See Docket No. 126-51.  Mr. Maday asserts he had intervening appointments on September 12 & 16, 2016, at which no one

---

[5] To this court's untrained eye, all the x-rays look the same.

addressed his complaints of pain in his foot.  See Docket No. 174 at p. 54.  In any event, Mr. Maday agrees there were no medical visits between September 16, 2016, and February 4, 2017, where he complained of foot pain.  Id.

The February 4, 2017, visit was scheduled to be a chronic care appointment to address Mr. Maday's diabetes, hypertension, and hyperlipidemia, but turned into a 55-minute visit where Mr. Maday wanted to discuss everything:  his bilateral index finger pain, his right foot pain,, his left big toenail pain, plantar warts on both feet, tiredness and fatigue, why he was not referred to an ear nose and throat specialist, and wanting stronger therabands for his exercises.  See Docket No. 126-51.  He asked why defendants did not follow up on his September, 2016, sick call visit where he complained about his hand and foot pain.  Id.  The nurse observed that, on that occasion, he was prescribed acetaminophen to help with the discomfort and that he did not return with any further complaints.  Id.  Mr. Maday was advised defendants could not know that his issues were unresolved if he did not keep them apprised of that.  Id.  Although examination of Mr. Maday's right foot was normal, defendants ordered x-rays.  Id.

The x-ray of Mr. Maday's right foot showed no acute fracture or dislocation, but instead a partially healed fourth metatarsal fracture.  See Docket No. 126-60.  Mr. Maday asserts the x-ray showed a "refracture" of his metatarsal, but the medical record does not state this.  Compare Docket No. 173 at p. 54, with Docket No. 126-60.  Defendants went over this x-ray with Mr. Maday on February 15, 2017.  See Docket No. 126-61.  He was prescribed

34

calcium with vitamin D for one year, a wheelchair for long distances, crutches for getting around on his unit, a posterior splint, no weightbearing, and a walking boot once a boot could be obtained in a size that would fit Mr. Maday. Id. Defendants also referred Mr. Maday back to see the outside podiatrist, Dr. Pedersen. Id.

Mr. Maday refused to wear the splint defendants offered, preferring to wait until he could get in to see Dr. Pedersen. See Docket No. 126-64. He signed a release of responsibility acknowledging he had been prescribed treatment, he had been given an opportunity to discuss his treatment with a medical provider, and he was making an informed choice ***not*** to follow the recommended medical treatment consisting of a right foot splint and ace wrap. See Docket No. 126-65.

In Mr. Maday's own words, he was afforded treatment using an ultrasonic bone growth stimulator beginning March 1, 2017. See Docket No. 1 at p. 23, ¶ 93. This treatment lasted until May 27, 2017, at which time Dr. Pedersen gave Mr. Maday a "clean bill of health." Id.; id. at ¶ 95.

The court previously found that the failure of Dr. Brad Adams to provide a walking boot on February 15 was not deliberately indifferent. See Docket Nos. 96 & 113. Defendants simply had no walking boot large enough to fit Mr. Maday's foot and calf. Id. They did the next best thing by prescribing a splint and then making arrangements to obtain a large enough walking boot. Id. Likewise, the remaining defendants were not deliberately indifferent in

35

failing to have a walking boot on hand when the partially-healed fracture was discovered.

Nor were defendants deliberately indifferent in referring Mr. Maday to a specialist, Dr. Pedersen.  As for defendants' failure to address Mr. Maday's foot pain between September 16, 2016 (giving Mr. Maday the benefit of the doubt), and February 7, 2017, that also did not constitute deliberate indifference.  On examination on September 7, there were no abnormalities observed, Mr. Maday did not appear visually to be in acute pain, and did not walk abnormally. Defendants prescribed acetaminophen and stretching exercises.  At this point, it was incumbent on Mr. Maday to notify defendants that their treatment did not alleviate his pain.  Mr. Maday certainly knows how to obtain medical attention.  And he did not pursue that medical attention for nearly 5 months. Defendants cannot be faulted for failing to treat a condition of which they were unaware.  The court recommends granting summary judgment to defendants on Mr. Maday's deliberate indifference claim related to the fact his metatarsal fracture had not fully healed.

### 8.    Failure to Provide Properly Fitting Diabetic Socks

Mr. Maday alleges in June, 2016, he began requesting properly fitting diabetic socks.  Defendants gave him diabetic socks in November, 2014,[6] but he alleges they did not fit him, leaving painful rings around his calf.  See

---

[6] The discrepancy in dates is not addressed by Mr. Maday.  He alleges the June, 2016, date in his supplemental complaint.  See Docket No. 94 at pp. 4-5, 15-16, claims 3 & 4.  But then he admits defendants gave him diabetic socks upon his request in November, 2014, in his summary judgment affidavit.  See Docket No. 174 at p. 41, ¶ 63.

36

Docket No. 174 at p. 41, ¶ 63.  He admits, however, that with the simple expedient of folding the elastic top of the sock over onto itself he was able to eliminate the painful rings formed around his calves.  Id.  Defendant Dr. Adams, who has since been dismissed from this lawsuit, told Mr. Maday that his diabetic socks were the appropriate size and offered to prescribe TED hose for Mr. Maday in place of the diabetic socks he was receiving.  But Mr. Maday refused the TED hose.

In the absence of a valid medical order for diabetic socks, Mr. Maday cannot assert a claim for deliberate indifference for failing to provide such socks.  See Gard, 4:14-cv-04023-LLP, Docket No. 134 at p. 71; Docket No. 149; Harp v. Sec. of Corrections, 2013 WL 1896930 (D.S.D. May 6, 2013).  Here, Mr. Maday was prescribed—and given--diabetic socks beginning November 24, 2014.  See Docket No. 1, p. 44, ¶ 146; Docket No. 94 pp. 4-5 & 15-16; Docket Nos. 126-26 & -27.  However, he was not happy with the diabetic socks given to him by defendants.  He wanted "Dr. Comfort" diabetic socks.  Id.

Between November 24, 2014, and the filing of this lawsuit,  Mr. Maday never notified defendant Muriel Namminga, the head of laundry and in charge of giving Mr. Maday his diabetic socks, that the socks he was given were too small.  See Docket No. 134 at p. 6-7, ¶¶ 17-19 (Namminga affidavit). Mr. Maday was seen daily by medical staff for blood sugar readings and he never, during any of these visits between November, 2014, and June, 2016, indicated his diabetic socks were too small.  See Docket No. 132 at p. 14, ¶ 49; Docket No. 138 at p. 13, ¶ 49.  During this interval, Mr. Maday also had

37

innumerable medical appointments and never, during any of these numerous appointments, did he complain about too-small diabetic socks.  <u>See</u> Docket No. 132 at p. 14, ¶50; Docket No. 138 at p. 13, ¶ 50.

Mr. Maday submitted a number of kite request slips during the period from November, 2014, to June, 2016, but he never requested larger diabetic socks.  <u>See</u> Docket Nos. 126-33 to -41; Docket No. 132 at p. 14-15, ¶51; Docket No. 138 at p. 13, ¶51.  Also during this period of time, Mr. Maday filed a number of inmate grievances, but none of his grievances notified defendants he believed his socks were too small.  <u>See</u> Docket No. 127 at p. 7, ¶ 16 (Reyes affidavit).

On June 27, 2016, Mr. Maday saw prison medical staff and for the first time complained about his diabetic socks.  <u>See</u> Docket No. 126-43.  However, it was not the size he complained about, but rather the fact that he wanted "Dr. Comfort" diabetic socks because they had more padding.  <u>Id.</u>  When medical staff determined "Dr. Comfort" socks were not medically warranted, Mr. Maday filed a kite requesting "Dr. Comfort" socks on July 14, 2016.  <u>See</u> Docket No. 126-44.  Again, though, he did not indicate size was an issue, but rather the extra padding he thought "Dr. Comfort" socks would provide.  <u>Id.</u>  He did not indicate his current socks did not fit.  <u>Id.</u>

The first indication in the record that Mr. Maday complained about the size of his diabetic socks was on August 9, 2016, during a medical visit.  <u>See</u> Docket No. 126-46.  He complained on this date that his socks left a ring after he had been on his feet all day.  <u>Id.</u>  Dr. Brad Adams evaluated the socks and

concluded Mr. Maday's current socks fit him adequately.  Id.  Dr. Adams

explained to Mr. Maday that he had "dependent edema" and the reason he was

getting swelling was due to the dependent edema and not ill-fitting socks.  Id.

Dr. Adams informed Mr. Maday the way to treat his dependent edema was with

TED hose and Dr. Adams offered to prescribe such hosiery to Mr. Maday.  Id.

Mr. Maday rejected that suggestion.  Id.

On October 19, 2016, Mr. Maday filed an informal resolution request

(IRR) asking for larger socks.  See Docket No. 126-29.  No change was offered

by defendants.  See Docket No. 126-30.  On October 20, 2016, Mr. Maday filed

a request for administrative remedy (AR) stating that he had two pairs of

diabetic socks that fit him and two pair that were too small.  See Docket

No. 126-31.  He requested defendant issue him additional pairs of socks that

fit.  Id.

At the end of the day, Mr. Maday admits in his own words that he had at

least two pair of diabetic socks that fit him.  Id.  He also admits he could

eliminate the ring around his calf by merely folding down the top of the sock.

See Docket No. 174 at p. 41, ¶ 63.  He has shown no evidence that defendants

were deliberately indifferent in failing to give him properly fitting diabetic socks.

He had at least two pair and he could render the other pair appropriate.  A

medical doctor examined the socks and determined they were the right size.

Mr. Maday was offered TED hose which he refused.  He has not shown

there is some minimum number or type of socks required by the Eighth

Amendment to the United States Constitution.  The court recommends

granting defendants summary judgment on Mr. Maday's § 1983 claim premised on the provision of too-small diabetic socks.

## E.    First Amendment Claims

### 1.    February, 2016, Issue of Sports Illustrated Swimsuit Edition

Mr. Maday claims defendants engaged in "unnecessary and arbitrary censorship" when it refused to allow him to receive the February, 2016, swimsuit edition of Sports Illustrated ("SI").  Claims under 42 U.S.C. § 1983 can only be asserted for violations of constitutional rights.  Liberally construing Mr. Maday's claim, the court interprets this as claim asserted for violation of Mr. Maday's First Amendment freedom of speech rights.

The court cannot address the merits of Mr. Maday's claim as it pertains to the February, 2016, swimsuit edition of SI.  All claims brought by prisoners under § 1983 must first be exhausted in prison administrative procedures and Mr. Maday failed to completely exhaust his administrative remedies.

In 1996 Congress enacted the Prison Litigation Reform Act, 110 Stat. 1321-71, as amended, 42 U.S.C. § 1997e *et seq*, in order to reduce frivolous litigation emanating from the nation's prisons.  Woodford v. Ngo, 548 U.S. 81, 84 (2006).  One part of that Act was codified at 42 U.S.C. § 1997e(a) which requires administrative exhaustion as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

See 42 U.S.C. § 1997e(a).

Exhaustion under § 1997e(a) is mandatory, requires prisoners to exhaust all "available" remedies, and is required even where the relief sought (i.e. money damages) is not available through administrative avenues. Woodford, 548 U.S. at 85. Exhaustion is required for any suit challenging prison conditions, even if the suit is not brought under § 1983. Id. "Prison conditions" means "all inmate suits about prison life, whether they involve general circumstances in prison or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). Finally, in order to satisfy § 1997e(a), the prisoner must properly exhaust. Woodford, 548 U.S. at 93. It is not sufficient for the prisoner to show that, although he has procedurally defaulted his administrative claim, there is no further avenue of administrative action open to him. Id. at 93-103.

Failure to exhaust administrative remedies is an affirmative defense which the defendant must plead and prove. Jones v. Bock, 549 U.S. 199, 212 (2007). The PLRA itself contains no requirement that every defendant named in the § 1983 lawsuit have previously been named in the prisoner's administrative complaint. Id. at 217-18. Rather, whether a prisoner has properly exhausted must be determined from the prison regulations themselves. Id. at 218-19. Those regulations, not the PLRA, "define the boundaries of proper exhaustion." Id. at 218.

Although a prisoner is not required to plead facts supporting exhaustion in his or her complaint, dismissal at the screening stage for failure to exhaust may be allowed if the allegations in the complaint show conclusively that the

41

affirmative defense is established in a particular case. Id. at 215-16. If a complaint contains both exhausted and unexhausted claims, the court should decide the exhausted claims on their merits and dismiss without prejudice the unexhausted claims. Id. at 224.

In the case of Chelette v. Harris, 229 F.3d 684, 685-86 (8th Cir. 2000), a prisoner brought an action pursuant to § 1983, alleging that he had received inadequate medical treatment of his wrist following an altercation with another inmate. Chelette "alerted prison warden Grant Harris to the problem." Id. at 686. According to Chelette, Harris assured Chelette that the problem "would be taken care of." Id. When Chelette allegedly received inadequate medical care, he filed a complaint in federal district court seeking damages and injunctive relief. Id. Chelette did not follow the state prisoner grievance procedure because, he wrote, "Warden Harris stated he would take care of the matter," thus leading Chelette to believe he did not have to follow the administrative procedure. Id.

Although the Eighth Circuit held that exhausting administrative procedures was not an issue touching on the court's subject matter jurisdiction, nevertheless it was an important requirement bearing on the timing of when prisoners' complaints could be brought to federal court. Id. at 686-88. Once a defendant files a motion to dismiss based on failure to exhaust, it is incumbent on the court to determine whether the prisoner in fact did exhaust. Id. at 688. In Chelette's case, the court held that he clearly did not exhaust. Id. "If administrative remedies are available, the prisoner must

42

exhaust them," without regard to the prisoner's subjective beliefs, whether those beliefs are logical or not.  Id.  Since Chelette did not exhaust, the court directed that his complaint be dismissed without prejudice.  Id.  The time frame the court must examine in determining if a prisoner has exhausted his administrative remedies is at the time the prisoner filed his complaint in federal court.  Johnson v. Jones, 340 F.3d 624, 627 (8th Cir. 2003).

In a similar case, a prisoner, Lyon, brought suit under § 1983 alleging prison officials had violated his First Amendment freedom of religion rights by excluding him from participating in Jewish services.  Lyon v. Vande Krol, 305 F.3d 806, 807 (8th Cir. 2002) (en banc).  Prior to filing his suit in federal court, Lyon protested his exclusion to the prison's chaplain.  Id. at 808.  The chaplain explained to Lyon that he was being excluded based upon the recommendation of a Rabbi who acted as a Jewish consultant to the prison.  Id.  Lyon then wrote a memo to the warden of the prison; the warden responded that prisoners who had not converted to Judaism would, at the recommendation of the prison's Jewish experts, not be allowed to participate in Jewish services, although they could engage in a course of Jewish study.  Id.  Lyon admitted that he knew of the prison grievance procedure, but that he did not comply with that procedure because prison officials had implied that the decision did not rest in the hands of prison officials, but rather in the hands of Jewish experts.  Id.

The Eighth Circuit held Lyon's case must be dismissed.  Id. at 809. Although prison officials may not prevent inmates from exhausting their

43

remedies, the court held that defendants had not prevented Lyon from exhausting his remedies here. Id. at 808-09. Furthermore, the court relied upon Chelette in holding that Mr. Lyon's subjective beliefs about whether any meaningful relief could be obtained through the administrative process were irrelevant. Id. at 809. The court noted that there was an administrative procedure available; Lyon knew about the procedure; Lyon chose not to follow the procedure; and defendants never told Lyon that no procedure existed. Id. Under these facts, then, dismissal for failure to exhaust was required. Id.

In another case Porter, a prisoner, filed a grievance which, under prison rules, the warden was to respond to within 40 days after receipt. See Porter v. Sturm, 781 F.3d 448, 449-50 (8th Cir. 2015). The warden did not respond for more than 14 months. Id. at 450-51. The prisoner did not appeal from the warden's response, although he had a right to under the prison's administrative procedures; instead Porter brought suit in federal court. Id. at 451. Porter tried to excuse his failure to exhaust by arguing that prison officials withheld grievance procedures from him and that such procedures would be ineffective. Id. at 452. The Eighth Circuit rejected these excuses, noting that the delays did not cause remedies to be unavailable and defendants had not prevented Porter from appealing. Id. Porter knew of his ability to appeal and chose not to pursue it. Id. Accordingly, the court held that Porter's complaint must be dismissed without prejudice. Id.

Here, similar to the facts of Chelette, Porter, and Lyon, Mr. Maday clearly knew of the administrative procedure in the prison because of the numerous

44

claims presented herein which he did properly exhaust. The DOC Administrative Remedy Policy requires an inmate to follow a two-step process if he wishes to initiate a complaint concerning the application of any administrative directive, policy, unit rule or procedure or if he wishes to complain about any oversight or error affecting him. See DOC Policy 1.3.E.2. First, the inmate submits an Informal Resolution Request (IRR). Id. If the issue is not resolved within 10 days of filing the IRR, the inmate must file a Request for Administrative Remedy (AR). Id. An inmate must initiate his administrative complaint within 30 days of the date of the incident. Id.

Although Mr. Maday filed an IRR in regard to the confiscation of his February, 2016, SI swimsuit edition magazine (Docket No. 126-98), and that IRR was rejected eight days later (Docket No. 126-99), Mr. Maday did not then follow the next step by filing an AR (Docket No. 127 at p. 9, ¶ 24). Therefore, by neglecting to file an AR, Mr. Maday has failed to exhaust his administrative remedies regarding the seizure of his February, 2016, SI magazine. Accordingly, the court recommends granting defendants' motion for summary judgment on Mr. Maday's First Amendment claim based on the February, 2016, edition of SI.

### 2. First Amendment Free Speech Rights in Prison

Turner v. Safley, 482 U.S. 78, 81-82 (1987), is the case governing a prison's regulation of material otherwise protected by the First Amendment when an inmate seeks to receive that material in prison. The Eighth Circuit recently summarized Turner as follows:

45

As the Supreme Court instructed in Turner, prisoners' rights cases require courts to strike a balance between two competing principles. "The first of these principles is that prison walls do not form a barrier separating prison inmates from the protections of the Constitution, including those of the First Amendment." At the same time, Turner acknowledged that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." From a functional perspective, the Court noted, "running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." Thus, "separation of powers concerns counsel a policy of judicial restraint" when it comes to reviewing prison regulations. Moreover, "where a state penal system is involved," as it is here and was in Turner, federalism serves as an "additional reason to accord deference to the appropriate prison authorities." In light of these dueling interests, the Court held that "a lesser standard of scrutiny is appropriate in determined the constitutionality of prison rules." Namely, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."

Sisney v. Kaemingk, 886 F.3d 692, 697 (8th Cir. 2018) (cleaned up).

The Turner reasonable relation standard requires the court to evaluate

four factors:

1.    whether the governmental objective underlying the regulations is legitimate and neutral, and whether the regulations is rationally related to that governmental objective;

2.    whether there are alternative means of exercising the right that remain open to prisoners;

3.    what impact the accommodation of the plaintiff's asserted constitutional right will have on others (guards and inmates) inside the prison; and

4.    whether there are obvious, easy alternatives whose existence show that the regulation in question is not reasonable, but is an "exaggerated response" to prison concerns.

Turner, 482 U.S. at 89-91.  The court applies the Turner factors to Mr. Maday's First Amendment claims.

### 3.     2015 SI Swimsuit Edition

#### a.     Qualified Immunity as to Money Damages

The South Dakota Department of Corrections (DOC) has an anti-pornography policy applicable to its penal institutions.  This is DOC policy 1.3.C.8 and it provides in pertinent part as follows:

> The Department of Corrections (DOC) prohibits the purchase, possession, and attempted possession and manufacturing of pornographic materials by offenders housed in its institutions.
>
> * * *
>
> Pornographic Material:  Includes books, articles, pamphlets, magazines, periodicals, or any other publications or materials that feature nudity or "sexually-explicit" conduct.  Pornographic material may also include books, pamphlets, magazines, periodicals or other publication or material that features, or includes photographs, drawings, etchings, paintings, or other graphic depictions of nudity or sexually explicit material.
>
> Nudity:  "Nudity" means a pictorial or other graphic depiction where male or female genitalia, pubic area, buttocks or female breasts are exposed.  Published material containing nudity illustrative of medical, educational or anthropological content may be excluded from this definition.
>
> Sexually Explicit:  "Sexually Explicit" includes written and/or pictorial, graphic depiction of actual or simulated sexual acts, including but not limited to sexual intercourse, oral sex or masturbation.  Sexually explicit material also includes individual pictures, photographs, drawings, etchings, writings or paintings of nudity or sexually explicit conduct that are not part of a book, pamphlet, magazine, periodical or other publication.
>
> Offender:  For purposes of this policy, an offender is an inmate (in the custody of the South Dakota DOC institutional system) . . .

See DOC Policy 1.3.C.8.

Under this DOC policy, pornography is contraband. Id. Violation of the DOC policy can result in disciplinary action against an offender and confiscation of the pornography. Id. In addition, violation of the policy constitutes a violation of the STOP Program contract. Id.

The warden of each South Dakota penal institution is authorized to institute procedures at his or her institution to implement the DOC pornography policy. Id. The minimum requirements for those procedures are preventing pornographic materials from infiltrating the institution through correspondence and visits, rejection of all incoming or outgoing pornography, designating staff who will have authority to determine what is pornographic, and creating a system for sharing and coordinating information about pornography between South Dakota penal institutions. Id.

If an offender disagrees with the institution's decision that a particular item is pornography, he may appeal the decision through the administrative remedy process described above. Id.

It is questionable whether Mr. Maday has stated a constitutional claim at all. He appears to complain that defendants are simply not following their own policy and definitions. For example, with regard to the 2015 SI swimsuit edition, he asserts defendants confiscated the magazine because it contained "nudity." See Docket No. 1 at p. 40, ¶ 138. He then simply states, "There was no nudity in this issue and it was simply denied for arbitrary and capricious reasons." Id. Mr. Maday appears to be arguing defendants simply did not

follow their own rule against pornography because they confiscated something as "nudity" that was not in fact "nudity."

This is made clearer when Mr. Maday responded to defendants' summary judgment motion.  He notes the DOC pornography policy defines "nudity" as "exposed" genitalia, buttocks, or female breasts.  See Docket No. 174 at p. 15. Focusing on the word "nipple," rather than "breast" as described in the DOC policy, Mr. Maday argues that the "nipples" in his swimsuit magazine were merely "visible," not "exposed."  Id.  Prison officials' failure to follow their own internal regulations, without more, does not state a constitutional violation. Phillips v. Norris, 320 F.3d 844, 847 (8th Cir. 2003).

Assuming that Mr. Maday has articulated an as-applied challenge to the DOC policy regarding his 2015 SI magazine, the court finds that claim fails as well.  Defendants filed under seal a complete copy of the 2015 SI swimsuit edition.  See Docket No. 126-127 through -130 (2015 SI swimsuit edition and three versions of the 2016 SI swimsuit edition).  The court has examined those exhibits.[7]  Examination of the 2015 magazine reveals multiple photographs of fully exposed female buttocks.  See 2015 SI, before the Table of Contents and pp. 24, 106, 124, 127, 132, 147, 164, 167, 169, 191.  Also contained therein are female breasts fully revealed through sheer material where the nipple is visible.  Id. at pp. 19, 118, 121.  Several fully naked female breasts are

---

[7] The Eighth Circuit has stated that the court must conduct an independent review of the evidence to ensure there has not been an exaggerated response to prison concerns relative to this particular item.  Murchison v. Rogers, 779 F.3d 882, 888 (8th Cir. 2015).

presented in a side view.  See, e.g. at p. 20.  And one completely naked woman is pictured in the magazine in a side view.  Id. at p. 129.

The DOC definition of nudity includes depictions of bare buttocks or bare breasts—not merely bare nipples--so the 2015 SI swimsuit edition clearly fits that definition of "nudity."  The court finds the censorship of the 2015 SI swimsuit edition was not an exaggerated response to prison concerns in relation to this particular item.  Murchison v. Rogers, 779 F.3d 882, 888 (8th Cir. 2015).

In arguing in favor of qualified immunity, defendants argue that the state of the law in 2015 when Mr. Maday was denied his SI magazine was not such as to put defendants on notice they would be violating Mr. Maday's constitutional rights by confiscating a magazine containing nudity in sexual poses intended to sexually arouse the viewer.  See Docket No. 126 at p. 79. Defendants have cited to cases holding specifically that the SI swimsuit edition could permissibly be banned under prison regulations prohibiting depictions of nudity and sexually explicit behavior.  Id. at pp. 78-79 (citing Heard v. Bravo, 2015 WL 13658597 at **2-3 (D.N.M. Aug. 24, 2015) ; and Rapp v. Barboza, 2016 WL 4223974 at *9 (N.D.N.Y. Jul. 19, 2016)).

Mr. Maday has failed to cite any case or authority establishing as of 2015 that prison inmates clearly have a constitutional right to receive depictions of naked buttocks and naked breasts.[8]  Furthermore, he asserts the wrong legal

---

[8] He has not cited any case from any year establishing that proposition, but the burden to resist defendants' qualified immunity claim requires him to show the

standard.  He asserts defendants must show "a clear and present danger to the security, order and rehabilitation of inmates" in order to justify confiscating his 2015 SI swimsuit edition.  <u>See</u> Docket No. 174 at p. 16.  As noted above, the correct legal standard requires defendants to show only that their policy was reasonably related to a legitimate penological goal.  <u>Sisney</u>, 886 F.3d at 697.

Mr. Maday argues, too, that defendants' pornography policy is not necessary because they allow pornographic images that inmates obtain via tablets they have recently been issued.  <u>See</u> Docket No. 174 at p. 16. Defendants assert they did not allow such images, but acknowledge that inmate were able to obtain images in violation of the pornography policy by downloading album covers in association with music downloads that were allowed on the tablets.  <u>See</u> Docket No. 136 at p. 6.  Defendants assert that problem was solved and inmates can no longer download album cover art.  <u>Id.</u>

Mr. Maday asserts inmates continue to have access to pornographic images through their tablets.  <u>See</u> Docket No. 174 at p. 16.  But then he later admits in the same affidavit he has no knowledge of any steps defendants may have taken to eliminate the pornography inmates were accessing on their tablets.  <u>Id.</u> at p. 82, ¶ 203.  The court need not resolve this dispute.  That the defendants' pornography policy is capable of being evaded by determined inmates does not render that policy unconstitutional nor does it constitute implicit permission on the part of defendants to allow porn.

---

constitutional right was clearly established in 2015, so the court refers to that time frame.

Qualified immunity will be denied only where the constitutional right at issue was "clearly established" at the time of the officials' allegedly violative acts.  Saucier, 533 U.S. at 201.  The Rapp case cited by defendants specifically noted that the determination of what constitutes "sexually explicit" material was not so clearly established in 2016 that defendants in that case would know they were violating a prisoner's rights by denying him access to sexually explicit material.  Rapp, 2016 WL 4223974 at *9 n.11 (citing Prison Legal News v. Stolle, 2014 WL 6982470 at ** 15-16 (E.D. Va. Dec. 8, 2014); Elfand v. County of Sonoma, 2013 WL 1007292 at *4 (N.D. Cal. Mar. 13, 2013); Woods v. Director's Review Committee, 2012 WL 1098365 at *1 (S.D. Tex. Mar. 30, 2012)).

The same conclusion applies with equal force in Mr. Maday's case.  The right of prisoners to receive depictions of actual nudity was not "clearly established" in 2015 when defendants confiscated Mr. Maday's February, 2015, SI swimsuit edition.  Accordingly, the court recommends granting defendants' motion for summary judgment based on qualified immunity as to Mr. Maday's First Amendment claim in connection with the 2015 SI swimsuit edition.

### b.    Injunctive Relief/Official Capacity Claim

Mr. Maday's complaint seeks both money damages and injunctive relief for the alleged constitutional violation of denying him receipt of the 2015 SI swimsuit edition.  See Docket No. 1 at pp. 46, ¶154; 48, ¶ 162.  He sues every defendant in both their individual and official capacities.  Id. at pp. 3-6,

¶¶ 5-38.  In their summary judgment motion on Mr. Maday's 2015 SI swimsuit edition magazine claim, defendants argue only that they are entitled to summary judgment on the basis of qualified immunity because the asserted constitutional right was not clearly established.  See Docket No. 126 at pp. 78-83.  They do not address whether a constitutional right exists in general, they do not discuss the SD DOC pornography policy or its supporting rationale, and they do not assert or discuss the Turner factors.

Qualified immunity protects defendants only from claims for money damages in their individual capacities.  Hafer, 502 U.S. at 25.  Because defendants' summary judgment argument on this issue was grounded solely in qualified immunity—i.e. arguing that the right to the 2015 SI swimsuit edition was not "clearly established" in 2015--Mr. Maday's request for injunctive relief against defendants in their official capacities on this claim survives summary judgment.  Pearson, 555 U.S. at 242-43; Grantham, 21 F.3d at 295.

### 4.    Deprivation of Hardcover Books

Mr. Maday asserts defendants violated his First Amendment rights when they denied him receipt of hard cover books delivered to the MDSP in November, 2016, and again in March, 2018.  See Docket No. 1 at p. 40-41, claim 12; Docket No. 94 at pp. 7-8.  The book rejected in November, 2016, was entitled "Media Neat."  See Docket No. 126-101.  The title of the second book withheld March 6, 2018, does not appear in the record.

The SD DOC policy in question provides that hardcover books for individual or group use are not allowed and that all books, regardless of

content or purpose, must be softcover.  <u>See</u> SD DOC 2.3.C.4.  The policy allows hardcover books that are already in the institution to remain, but disallows any new hardcover books.  <u>Id.</u>

Defendants argue their decision to deny Mr. Maday receipt of hardcover books was justified under the <u>Turner</u> factors.  They assert the ban on any new hardcover books being delivered to the prison is reasonably related to legitimate penological objectives of security and prevention of contraband, citing cases upholding such bans on the basis that hardbound books can be used as weapons, and that contraband can be hidden in their bindings and hollowed-out pages.  <u>See</u> Docket No. 126 at pp. 83-89.  Defendants point out that Mr. Maday has reasonable alternatives to exercise his First Amendment rights, namely he can borrow books from the prison library or order soft-bound versions of the books he wishes.  <u>Id.</u>

Defendants cite to <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979).  In the <u>Bell</u> case, pretrial detainees challenged the policy at their detention center prohibiting them from receiving hardcover books.  <u>Id.</u> at 548-49.  Softcover books could be received by detainees if they were mailed to the detainee directly from the publisher.  <u>Id.</u> at 549.  The Court ruled the policy did not infringe upon the detainees' First Amendment rights.  <u>Id.</u> at 550.  Instead, the Court held the restriction was "a rational response by prison officials to an obvious security problem."  <u>Id.</u>  "It hardly needs to be emphasized that hardback books are especially serviceable for smuggling contraband into an institution:  money, drugs, and weapons easily may be secreted in the bindings.  They are also

54

difficult to search effectively.  There is simply no evidence in the record to indicate that [prison] officials have exaggerated their response to this security problem and to the administrative difficulties posed by the necessity of carefully inspecting each book mailed from unidentified sources." Id. at 550-51.

In further support of its holding, the Court noted the prison policy was content-neutral.  Id. at 551.  And the Court noted detainees had alternative means of obtaining reading material that was not burdensome or insufficient, such as softbound books and a library for use by inmates.  Id.  Although Bell was decided before the Court decided the Turner case, the Bell Court's analysis substantially tracks the four-part Turner analysis.  Compare Bell, 441 U.S. at 549-51, with Turner, 482 U.S. at 89-91.

The rights afforded to pretrial detainees such as the plaintiffs in the Bell case are greater than the rights afforded to convicted inmates.  Walton v. Dawson, 752 F.3d 1109, 1117 (8th Cir. 2014).  Therefore, if a ban on any delivery of hardcover books is permissible under the First Amendment regarding pretrial detainees, it should be equally permissible for convicted inmates, whose rights are less.

In fact, that is what numerous courts have held.  See Pfeil v. Lampert, 603 Fed. Appx. 665, 669-70 (10th Cir. Feb. 20, 2015) (applying Turner framework to reject inmate's claim that the denial of hardcover books violated his First Amendment rights); Evans v. Tarrant County, 36 F.3d 90, 1994 WL

55

523818 at *1 (5th Cir. Sept. 14, 1994) (same); <u>Skelton v. Pri-Cor, Inc.</u>, 963 F.2d 100, 102-04 (6th Cir. 1991) (same).

Defendants point out that Mr. Maday has not alleged he had no reasonable alternative such as to obtain the same book in softcover or through the prison library. Based on the lack of any such assertion, defendants argue Mr. Maday's claim must fail on this basis too. A number of courts have premised their denial of First Amendment claims regarding hardbound books on the inmate's failure to establish there was no reasonable alternative. <u>See</u> <u>Dunlap v. Losey</u>, 40 Fed. Appx. 41, 43 (6th Cir. May 15, 2002) (inmate failed to establish softcover book or prison library was not a reasonable alternative); <u>Leachman v. Thomas</u>, 229 F.3d 1148, 2000 WL 1239126 at *4 (5th Cir. Aug. 9, 2000) (same); <u>Brownlee v. Conine</u>, 957 F.2d 353, 354 (7th Cir. 1992) (same).

The <u>Pfeil</u> court noted that the prison's adoption of a ban on hardcover books in that case was necessary in order to meet requirements for accreditation with the American Correctional Association. <u>Pfeil</u>, 603 Fed. Appx. at 669.

Mr. Maday has several responses. First, he asserts' defendants' justification under <u>Turner</u> is inadequate unless defendants can show inmates actually have used hardcover books as weapons or to secrete contraband. <u>See</u> Docket No. 174 at p. 18. The <u>Turner</u> analysis does not require defendants to sit back and wait for actual harm to occur so long as there is a reasonable relationship between the policy and the penological goal. The multiple cases cited above demonstrate such a relation.

In addition, Mr. Maday asserts hardcover copies of the Koran and the Bible are allowed at MDSP and that the prison library has hardcover books. See Docket No. 174 at pp. 18, 84. As with the pornography policy, the fact that an otherwise content-neutral policy admits of exceptions does not render the policy unconstitutional. The <u>Leachman</u> court specifically found that a prison exception for hardbound books from the Church of Jesus Christ of the Latter Day Saints and the Gideons was constitutional because those two organizations each produced their respective religious tracts only in hardbound form. <u>Leachman</u>, 2000 WL 1239126 at *4. As to library books, the court notes the fact that inmates have to eventually return these books to the prison library neutralizes the use of such books for hiding contraband.

Third, Mr. Maday asserts the two books he was denied were sent to him by third parties as gifts directly from the publisher. See Docket No. 174 at p. 83, ¶ 204. Mr. Maday asserts this shows he "did not have alternate means of purchasing these books in softcover or checking them out at the library." <u>Id.</u> Mr. Maday's assertion does not prove its point. He *could have* checked these books out if they were in the prison library.[9] Mr. Maday *could have* requested the donors to resend the same books to him in softcover. Finally, Mr. Maday *could have* ordered and paid for the books himself in softcover.

Finally, Mr. Maday draws upon his experience as a prison corrections officer in Wisconsin to assert that defendants could easily search hardcover

---

[9] He asserts the books are not in the prison library, but he never places into the record the title of the second book.

books to ensure no contraband was hidden therein.[10]  But the <u>Bell</u> Court specifically found that search of hardback books is "difficult" to perform effectively and required a "substantial and inordinate amount of available staff time." <u>Bell</u>, 441 U.S. at 549, 551.  <u>See also</u> <u>Pfeil</u>, 603 Fed. Appx. at 669 (prohibition on hardbound books reduces time and resources prison staff must spend on searching inmates' cells).  Simply because hardcover books *can* be searched does not mean defendants are constitutionally *required* to allow hardcover books into the prison and to dedicate the necessary staff time to search them.

The court concludes defendants' motion for summary judgment based on the denial to Mr. Maday of hardcover books should be granted.  Mr. Maday has failed under <u>Turner</u> to demonstrate that his First Amendment rights were infringed upon.

### 5.    Denial of Mail Because it Contained Colored Paper

As with the 2015 SI swimsuit edition claim, it appears Mr. Maday is not raising a constitutional issue, but rather complaining that defendants did not follow their own internal policy for handling mail containing contraband.  He states as follows:

> On 3/13/18 a letter sent to me from Dr. Andrea Nelson containing a money order and correspondence was denied by Defendant Mike

---

[10] The court declines Mr. Maday's invitation to declare he is an expert in corrections matters pursuant to FED. R. EVID. 702.  <u>See</u> Docket No. 174 at p. 3. The court finds expert testimony is not necessary to "help the trier of fact or understand the evidence or determine a fact in issue."  <u>See</u> Rule 702(a).  By definition, a court ruling on a summary judgment motion is not allowed to resolve credibility questions or resolve disputed issues of material fact.  <u>See</u> FED. R. CIV. P. 56.

> Grosshuesch because it allegedly contained contraband (colored paper).  At this point, per policy 1.5.03 I should have been given a choice as to what to do with the allowable items.  I was not given a choice and was only issued a Mailroom Correspondence Rejection Notice—Offender.  When I filed an Informal Resolution Request on this matter Unit Coordinator Tiffany Voigt cited part of policy 1.5.03 and ultimately ignored the issue.

See Docket No. 94 at pp. 7-8, ¶ 522.

In his affidavit in opposition to summary judgment, Mr. Maday argues repeatedly that the policy defendants rely upon to deny him receipt of this mail did not go into effect until several weeks after the mail was rejected.  Again, however, all this shows is that defendants arguably did not follow their own policy.

As stated above, if Mr. Maday's claim consists solely in the allegation defendants failed to follow their own mail policy, this assertion—without more—does not state a constitutional violation.  Phillips, 320 F.3d at 847.  A plaintiff asserting a claim under § 1983 must alleged a deprivation of a constitutional right.  See 42 U.S.C. § 1983.

Defendants address the facts asserted by Mr. Maday and also the issue of the constitutionality of their actions.  First, defendants assert Mr. Maday has not accurately set forth the facts in his complaint.  Instead, they point to exhibit 106 in which Mr. Maday directs defendants what to do with the allowable items as per DOC policy:  he directed defendants to "deposit the money order [and] dispose of the letter."  See Docket No. 126-106.  Thus, it appears defendants *did* follow their policy by giving Mr. Maday a chance to tell

59

defendants what to do with the allowable items and that Mr. Maday did in fact give defendants instructions as to what to do with his rejected mail.

In addition, defendants address the denial of mail containing colored paper under the <u>Turner</u> factors as a potential constitutional claim. The SD DOC policy requires general correspondence to be on plain white paper. <u>See</u> Docket No. 126-120. No postcards, personal greeting cards, colored inks, markers, or crayons are allowed. <u>Id.</u>

Defendants submitted the affidavit of defendant Denny Kaemingk, Secretary of the SD DOC, who stated the white-paper-only policy was adopted after it came to the attention of prison officials that narcotics and synthetic narcotics such as suboxone, methamphetamine, and LSD were being smuggled into prison using greeting cards and colored paper. <u>See</u> Docket No. 129 at p. 5, ¶ 7. Thus, defendants assert they have a legitimate penological objective (the prevention of the introduction of drugs into prison) which is reasonably related to the policy (prohibition of commercial greeting cards, colored paper, and colored ink/crayon). Defendants also point out Mr. Maday has reasonable alternative means of communication: he can receive letters written on white paper with pencil or pen, he can receive in-person visits, and he can receive telephone calls. <u>Id.</u> at ¶ 8.

Mr. Maday denies that inmates may *receive* telephone calls. <u>See</u> Docket No. 174 at p. 88, ¶ 219. However, he does not dispute that inmates can *make* outgoing telephone calls. <u>Id.</u> This is not a material issue.

60

The court agrees.  Mr. Maday has not shown that his First Amendment rights were violated when defendants denied him receipt of the March, 2018, letter from Dr. Nelson.  Accordingly, the court recommends granting defendants' summary judgment motion on this claim.

### 6.     Rejection of Letter from Mr. Maday's Brother

Again, the court concludes Mr. Maday is not asserting a constitutional violation with this claim, but instead a claim that defendants were not following their own policy.  Here is his statement of his claim in its entirety:

> On or about 4/4/2018 a letter sent to me by my brother was refused and marked return to sender by CO Mike Grosshuesch, Mailroom Supervisor.  I never received a notice from mailroom staff that this correspondence was rejected.  When I filed an Informal Resolution Request on this matter Unit Coordinator Tiffany Voigt replied "When it is apparent that the correspondence contains contraband without opening the letter it will be rejected."  This is contrary to policy 1.5.D.3, Inmate Correspondence, which states on page 5 that incoming general correspondence will be opened and inspected for contraband.  Per this policy the only correspondence that may be rejected is incoming correspondence not addressed to a specific inmate.  By replying the way she did Unit Coordinator Voigt is essentially condoning and excusing this act of censorship and retaliation.[11]

See Docket No. 94 at p. 8, ¶ 523 (emphasis in original).  Again, if all Mr. Maday is claiming is that defendants failed to follow their own mail policy, this—without more—does not state a constitutional claim.  Phillips, 320 F.3d at 847. Likewise in his response in opposition to defendants' summary judgment motions, Mr. Maday insists the defendants' policy "is mandatory . . . leaving no room for discretion."  See Docket No. 173 at p. 5.

---

[11] Mr. Maday also asserts a claim of retaliation based on this same conduct. That claim is separately addressed *infra* in this opinion.

The SD DOC policy in question requires incoming general correspondence to inmates to be in white envelopes and the only thing that can be affixed to them is a canceled stamp.  See Docket No. 126-120 at p. 5, ¶ 3. The return address may only be printed or typed or hand-written in ink.  Id. No padded envelopes, stickers, tape, sealing was, or sticky, foreign substances are allowed on the outside of the envelope.  Id.  No colored drawing on the envelope is allowed.  Id.  If an envelope does not meet these criteria, DOC policy directs that the envelope be returned, unopened, to the sender.  Id.

This DOC policy was first adopted in April, 2018, very close to the same time that Mr. Maday alleges his brother's letter was returned, unopened.  Id. at p. 1.  Therefore, giving Mr. Maday the benefit of the doubt, he may have included this claim in this supplemental complaint because he did not know the new policy was in force.

Defendants never specify in this record what the open and obvious deficiency was that was apparent on Mr. Maday's brother's envelope, only that the envelope obviously did not conform to the above policy.  Therefore, according to the policy, it was properly rejected without opening it.  In Mr. Maday's IRR and AR, it asserts the envelope did comply with the new DOC policy.  There is some suggestion (but not an outright assertion) in Mr. Maday's response in opposition that the letter had a label affixed to it for the return address instead of being printed or typed or hand-written in ink.  See Docket No. 173 at p.6.  Mr. Maday suggests defendants could have simply removed the label and delivered the letter to him.  Id.

The court need not address this factual dispute because failing to follow an internal prison policy, without more, does not state a First Amendment violation.    Phillips, 320 F.3d at 847.  Accordingly, the court recommends summary judgment be granted to defendants on Mr. Maday's claim associated with returning his brother's letter without first opening it.

In the event a reviewing court finds Mr. Maday *has* actually asserted a First Amendment right, at least two courts have upheld similar prison mail policies for returning mail to senders if an obvious violation is observed with no notice to the inmate.  See Jeffries v. Snake River Corrections-Oregon, 2008 WL 3200802 at **4-5 (D. Ore. Aug. 4, 2008);

The Jeffries court addressed a prison policy that allowed prison officials to screen the exterior of envelopes addressed to inmates for noticeable violations of prison mail policy, such as stickers affixed to the outside of the envelope.  Jeffries, 2008 WL 3200802 at *4.  The policy provided that if prison staff rejected an envelope based on its exterior appearance, staff could return the letter unopened to the sender without providing notice to the inmate that the letter had been rejected.  Id.  The court applied the Turner factors and upheld the policy.  Id.  The court found the prison had a legitimate penological goal of preventing the introduction of drugs into the prison through stickers and the like.  Id.  The policy was reasonably related to that goal.  Id.  Furthermore, the inmate could still receive mail in conforming envelopes as well as in-person visits and telephone calls.  Id.

As to the lack of notice to the inmate when an unconforming envelope was returned unopened, the court noted this was the exact same policy used by the United States Postal Service.  Id. at *5.  Applying Turner, the court also upheld the lack-of-notice to the inmate portion of the policy.  Id.

The District of Nevada followed the Jeffries decision in upholding under Turner a nearly identical prison mail policy allowing the return of obviously nonconforming mail, unopened, and without notice to the inmate.  See Sikorski v. Whorton, 631 F. Supp. 2d 1327, 1347-48 (D. Nev. 2009).  Therefore, to the extent a reviewing court believes Mr. Maday *has* asserted a constitutional claim, the court concludes summary judgment should nevertheless issue in favor of defendants on this claim.

**F.    Denial of Access to the Courts Claims**

### 1.    The Law Applicable to Denial of Access to the Courts Claims

"To prove a violation of the right of meaningful access to the courts, a prisoner must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim."  Hartsfield v. Nichols, 511 F.3d 826, 831 (8th Cir. 2008) (quoting White v. Kautzky, 494 F.3d 677, 680 (8th Cir. 2007)).  "To prove actual injury, [a prisoner] must demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded."  Id. (quoting Lewis v. Casey, 518 U.S. 343, 353 (1996)) (cleaned up).

64

Th right of access to the courts imposes an obligation on prison authorities to provide indigent inmates with paper and pen to draft legal documents, notary services, and stamps to mail court documents.  <u>Bounds v. Smith</u>, 430 U.S. 817, 821 (1977), <u>overruled in part</u> <u>Lewis</u>, 518 U.S. at 354.[12] <u>Id.</u> at 824-25.  Prisoners, no less than lawyers, must also "know what the law is in order to determine whether a colorable claim exists, and if so, what facts are necessary to state a cause of action."  <u>Id.</u> at 825.  Thus, the right of access to the courts may be protected where prison officials either provide prisoners with adequate law libraries, or provide them with assistance from persons trained in the law—although other methods might also pass constitutional muster.  <u>Id.</u> at 828; <u>Lewis</u>, 518 U.S. at 351.

A prisoner asserting a claim of violation of his or her right of access to the courts must establish an "actual injury" in order to prevail on a § 1983 claim premised on that right.  <u>Lewis</u>, 518 U.S. at 351-52; <u>Moore v. Plaster</u>, 266 F.3d 928, 933 (8th Cir. 2001) (citing <u>Klinger v. Dept. of Corrections</u>, 107 F.3d 609, 617 (8th Cir. 1997)).

A claim based on denial of access to the courts rests on the plaintiff demonstrating that, because of defendants' actions, he has been "shut out of court" on a particular claim.  <u>Christopher v. Harbury</u>, 536 U.S. 403, 415 (2002).  This is true whether the plaintiff seeks to remove roadblocks to some future litigation, or whether the plaintiff claims some past litigation was

---

[12] The <u>Lewis</u> Court overruled statements in <u>Bounds</u> that suggested that the right of access to the courts required states to enable prisoners to *discover* grievances and to *Litigate effectively* once in court.  <u>Lewis</u>, 518 U.S. at 354.

prevented.  Id.  In both categories of cases, the plaintiff must identify a "nonfrivolous," "arguable" underlying claim that he was unable to bring.  Id.

The Lewis Court emphasized the types of cases outlined in Bounds to which the right of access to the courts applies:  direct appeals of criminal convictions, habeas petitions, and civil rights actions to vindicate basic constitutional rights.  Lewis, 518 U.S. at 354.  Thus, if a prison elects to provide a law library to its inmates, it need not provide every volume of the United States Code, most volumes of which concern federal laws that have no relation to prison inmates.  Id. at 355.  Likewise, access to legal resources concerning shareholder-derivative actions and slip-and-fall claims would fall outside the purview of the right of access to the courts.  Id.  Legal materials addressing these types of claims are simply outside the scope of materials prisoners need to "attack their sentences, directly or collaterally," or "to challenge the conditions of their confinement," matters that are at the heart of the right of access to the courts.  Id.  Denial of legal resources regarding these extraneous topics "is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration."  Id.

**2.    Application of the Law to Mr. Maday's Claims**

Mr. Maday alleges he was unable to file a state petition for habeas relief in Wisconsin state courts, the state of his conviction, because defendants denied him access to Wisconsin law.  See Docket No. 1 at p. 41, ¶ 141.  He also alleges he missed the deadline to seek a petition for a writ of certiorari in the United States Supreme Court because of lack of access to Wisconsin law.  Id.

at p. 42.  In his response in opposition to defendants' summary judgment motions, he admits he received access to Wisconsin law two days before his statute of limitations on his federal 28 U.S.C. § 2254 petition would have run. <u>See</u> Docket No. 173 at p. 6.  The state petition and the federal petition are linked in that a state inmate must first present to the state courts any claims he wishes to raise in a federal petition.  <u>See</u> 28 U.S.C. § 2254(b) and (c).

Other allegations include the assertion defendants refused to deliver a letter Mr. Maday wanted to send to an attorney.  <u>Id.</u> at p. 41.  Finally, he alleges a denial of access to the courts claim based on defendants' elimination of the law library and contract attorney, which had previously been the method of providing access to the courts.  Instead, defendants now provided inmates with their own electronic tablet on which is loaded a Lexis/Nexis app. Mr. Maday alleges this violates his constitutional right of access to the courts too.  <u>See</u> Docket No. 1 at p. 44, claim 19; Docket No. 94 at p. 18.  Mr. Maday acknowledged receiving access to Wisconsin state law materials on April 17, 2018.  <u>See</u> Docket No. 69.

In support of their motion for summary judgment, defendants have provided the context necessary to evaluate Mr. Maday's claim.  Following a jury trial, Mr. Maday was convicted on January 15, 2013, of three counts of first-degree sexual assault of a child.  <u>See</u> <u>Wisconsin v. Maday</u>, 892 N.W.2d 611, 613 (Wis. 2017).  Judgment of conviction was entered on May 28, 2013.  <u>See</u> Docket No. 126-126 at p. 9.  Mr. Maday was represented by counsel who filed several motions for extension of the time within which to file a notice of appeal

or to apply for postconviction relief.  Id. at pp. 5, 6, 7, 8, & 9.  Counsel then filed a state habeas petition on Mr. Maday's behalf.  Id. at p. 5.

Mr. Maday's habeas petition in Wisconsin state court alleged two grounds of ineffective assistance of counsel.  Maday, 892 N.W.2d at 614, 617; Docket No. 126-126 at p. 5.[13]  An evidentiary hearing was held on January 21, 2015, at which one witness testified.  Id.  Mr. Maday was present for the hearing along with his habeas attorney.  Id.

The trial court denied habeas relief on February 2, 2015, and Mr. Maday's habeas lawyer pursued an appeal to an intermediate appeals court, which reversed, holding Mr. Maday should receive a new trial.  Id. at p. 4; Wisconsin v. Maday, 871 N.W.2d 867, 2015 WL 6509465 at *6 (Ct. of App. Wis. Oct. 29, 2015) (unpub'd); Maday, 892 N.W.2d at 617.  The state appealed and the Supreme Court of Wisconsin reversed again, with the result that Mr. Maday was held not entitled to habeas relief.  Maday, 892 N.W.2d at 627.

Mr. Maday was represented by counsel throughout his habeas proceedings in Wisconsin state court—from October, 2014, through the date of the supreme court's opinion, April 5, 2017.  Id. at 611, 613; Docket No. 126-126 pp. 3-9.  Mr. Maday admits he was represented throughout these proceedings.  See Docket No. 174 at p. 93, ¶ 229.  He suggests he needed

---

[13] The state trial court's docket sheet indicates the petition was filed by Mr. Maday's counsel, Andrew Voigt, on December 10, 2014, rather than in October as recited in the supreme court opinion.  See Docket No. 126-126 at p. 5.

access to Wisconsin law during this period of time so as to be able to advise his Wisconsin lawyer about the law.  Id. at pp. 93-94, ¶229.

On May 29, 2018, Mr. Maday filed a second state habeas petition in Wisconsin state court.  See Docket No. 126-125 at p. 4 (Maday v. Jess, 3:18-cv-00596-bbc, Docket No. 8 (W.D. Wis. Nov. 7, 2018)).  He raised several challenges to his convictions in that state petition.  Id.  As of October 3, 2018, the Wisconsin state court had not yet ruled on Mr. Maday's second state habeas petition.  Id.

While his second state petition was still pending and without waiting for a decision from the Wisconsin state court, Mr. Maday filed a federal habeas petition pursuant to 28 U.S.C. § 2254 in the Western District of Wisconsin on August 2, 2018.  Id.  In his federal petition he alleged several claims, some of which were exhausted in state court and some of which were not.  Id.  The federal district court stayed Mr. Maday's § 2254 petition, letting him exhaust his unexhausted claims in Wisconsin state court; the stay is effective until 30 days after he finishes exhausting his unexhausted claims in Wisconsin state court.  Maday v. Jess, 3:18-cv-0596-bbc, Docket No. 17 (W.D. Wis. Feb. 14, 2019).

Mr. Maday came into custody at the MDSP in South Dakota in August, 2013.  He filed this § 1983 lawsuit on December 8, 2017.  At that point, his first state habeas petition had already been filed by his state habeas lawyer in the trial court in Wisconsin, the case had been appealed to the Wisconsin intermediate appellate court, and to the Supreme Court of Wisconsin.  His

69

representation by counsel in his Wisconsin habeas proceedings continued up to and through the Supreme Court of Wisconsin's issuance of its opinion on April 5, 2017. Because the law allows great flexibility to prisons in terms of how access to legal knowledge is given to prisoners, the fact that Mr. Maday had counsel throughout his first state habeas proceedings satisfies defendants' obligation to provide access to the courts. See Bounds, 430 U.S. at 828; Lewis, 518 U.S. at 351; Sahagian v. Dickey, 827 F.2d 90, 98 (7th Cir. 1987). Defendants were *not* required to provide Mr. Maday with *both* a lawyer *and* his own database of Wisconsin law. Id.

Mr. Maday also alleges he was denied access to the courts because he missed his deadline to file a petition for certiorari with the United States Supreme Court. See Docket No. 1 at p. 42, ¶ 141. Mr. Maday had 90 days from the date of the Supreme Court of Wisconsin's decision became final in order to file a petition for certiorari to the United States Supreme Court. SUP. CT. R. 13.1; Gonzalez v. Thaler, 565 U.S. 134, 149-50 (2012). But this is dictated by *federal* law, not the *state* law of Wisconsin. Defendants have asserted with sworn testimony that federal law is available to Mr. Maday at the MDSP on his tablet through the Lexis/Nexis app. So the failure of defendants to provide Mr. Maday with Wisconsin law for the 90 days following the April 5, 2017, filing of the Supreme Court of Wisconsin's opinion was not the cause of Mr. Maday's failure to meet the deadline for filing a petition for certiorari with the United States Supreme Court.

Furthermore, appeals to the Supreme Court are discretionary, not a matter of right.  See SUP. CT. R. 10.  The provision of law libraries or assistance from law-trained persons is not constitutionally required where an appeal as of right has been provided and the inmate then seeks discretionary review. Sahagian, 827 F.2d at 98 (citing Bounds, 430 U.S. at 827-28; and Ross v. Moffitt, 417 U.S. 600, 615 (1974)).  Mr. Maday's assertion that he was entitled to Wisconsin law in order to pursue a petition for a writ of certiorari to the United States Supreme Court is therefore doubly wrong.  Wisconsin law would not have helped him with such a petition and he was not entitled to a law library or the assistance of one trained in the law for the purpose of seeking a writ of certiorari because that appeal was discretionary.

Mr. Maday asserts defendants refused to deliver to the postal service a letter he had addressed to an attorney.  However, he failed to administratively exhaust this claim.  Although he filed an IRR, he did not follow the next step in the process by filing an AR.  Therefore, defendants' assertion that this claim is not administratively exhausted is meritorious.  The court recommends dismissal of the legal mail claim as a component of Mr. Maday's access to the courts claim as unexhausted.[14]  Porter, 781 F.3d at 452; Lyon, 305 F.3d at 809; and Chelette, 229 F.3d at 688.

_____

[14] It appears this dispute was over the cost of a stamp.  Mr. Maday asserted this letter constituted privileged legal mail and, therefore, he did not believe he should have to pay postage to send the letter.  Defendants state they intercepted the letter and refused to deliver it at their own postage expense because the letter did not bear the named lawyer's individual address, but rather was addressed to the Wisconsin state bar association's headquarters address.  See Docket No. 127 at pp. 12-14, ¶¶ 38-45.  Under SD DOC mail

Mr. Maday also suggests that his opportunity to file for federal habeas relief has been thwarted by defendants' denial of access to the courts. However, as can be seen, Mr. Maday has already filed a § 2254 habeas petition with the Western District of Wisconsin.  That petition is stayed, pending his exhaustion of state remedies through his second state habeas petition, which is also pending as of this writing.  The court concludes defendants' actions did not prevent Mr. Maday from filing a § 2254 petition either.

Finally, the court comes to Mr. Maday's claim that the South Dakota DOC's decision to give prisoners direct access to legal research materials on a tablet rather than through a physical law library violates his right of access to the courts.  Again, however, even if one is asserting a systemic type of denial of access to the courts claim based on lack of adequate law libraries or legal assistance by one trained in the law, or whether one is asserting a targeted claim based on specific acts of a defendant that are unique to the plaintiff, in either type of case, the plaintiff must show they were shut out of court. Christopher, 536 U.S. at 415.  Because Mr. Maday has not been prevented from filing a first state habeas petition, a second state habeas petition, and finally a federal habeas petition, he cannot show defendants have denied him

---

policy 1.5.D.3, mail addressed to a state bar association is not considered legal mail.  Id. at p. 13, ¶ 42.  Defendants instructed Mr. Maday he was free to send the letter with his own postage.  Id.   Mr. Maday provided a photocopy of the envelope.  See Docket No. 173-1 at p. 24.  An internet search confirms defendants' position in rejecting the document as deserving of free postage:  the address on Mr. Maday's envelope does not correspond to the addresses of either of the two offices of the law firm in which Deanne M. Koll is a lawyer. See https://www.bakkenorman.com/firm/offices, last checked March 5, 2019.

access to the courts.  He cannot show an "actual injury."  Accordingly, this court recommends defendants' summary judgment be granted as to all of Mr. Maday's denial of access to the courts claims.

## G.    Retaliation Claims

### 1.    The Law Applicable to Retaliation Claims

Mr. Maday alleges two categories of retaliation claims:  (1) retaliatory discipline and having his arch supports taken from him and (2) he alleges the interference with his mail previously discussed was motivated by retaliatory motives.  See Docket No. 1 at pp. 42-43, claims 14 & 15; Docket No. 94 at pp. 10-12, 18-19.

"A prisoner's Eighth Amendment rights are violated if prison officials 'impose a disciplinary sanction against a prisoner in retaliation for the prisoner's exercise of his constitutional right.' " Meuir v. Greene County Jail Employees, 487 F.3d 1115, 1119 (8th Cir. 2007).  See also Haynes v. Stephenson, 588 F.3d 1152, 115 (8th Cir. 2009).  A *prima facie* case of retaliatory discipline requires a plaintiff to show (1) that he exercised a constitutionally protected right, (2) that he was subsequently disciplined by prison officials, and (3) the motive for imposing the discipline was the exercise of the constitutional right.  Id.

To prevail on a claim of retaliation for violation of a First Amendment right, the plaintiff must show (1) that he engaged in a protected activity, (2) that the government defendant took adverse action against the plaintiff that would chill a person of ordinary firmness from continuing in the activity; and

73

(3) that the adverse action was motivated at least in part by the exercise of the protected activity.  Santiago v. Blair, 707 F.3d 984, 991 (8th Cir. 2013).

 The third element of the *prima facie* case requires the plaintiff to show that, "but for" the retaliatory motive, the disciplinary action would not have been taken.  Haynes, 588 F.3d at 1156.  The "but for" test applies to the defendants' motive, not to causation.  Beaulieu v. Ludeman, 690 F.3d 1017, 1025 (8th Cir. 2012).   The "causal connection is generally a jury question, . . . [but] it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury."  Beaulieu, 690 F.3d at 1025. Where the disciplinary action takes place "almost immediately" after a defendant learns of the protected constitutional activity, there is a sufficient nexus in time to show causation.  Haynes, 588 F.3d at 1156-57.  A span of three days between the alleged retaliation and the conclusion of the plaintiff's exercise of his constitutional rights was a sufficiently close nexus in time to stave off summary judgment.  Santiago v. Blair, 707 F.3d 984, 993 (8th Cir. 2013).  Where the allegedly retaliatory action takes place *before* a defendant knows that the plaintiff exercised a constitutional right, summary judgment in favor of the defendant is appropriate.  Beaulieu, 690 F.3d at 1025-26.

 In Meuir, the plaintiff had bleeding gums and toothaches for which he sought medicated mouthwash.  Meuir, 487 F.3d at 1117.  Defendants refused to provide the mouthwash, but instead gave him Tylenol and urged him to rinse his mouth with salt water.  Id.  After plaintiff's dental complaints continued, a visit to an outside dentist was scheduled; however, fearing that

the dentist would pull all his teeth, the plaintiff refused to go. Id. at 1117-18. Thereafter, the jail officials refused to give the plaintiff free Tylenol for his toothaches, although the plaintiff could still obtain Tylenol from the commissary at his own expense. Id. at 1118. The plaintiff brought suit, alleging retaliatory discipline. Id. The case was dismissed on defendant's rationale that plaintiff's refusal to go to the dentist convinced defendants that his dental condition was not that serious after all. Id. at 1119.

In Haynes, a prisoner filed a grievance against a prison employee alleging the employee cursed at the prisoner and threatened him. Haynes, 588 F.3d at 1155. The employee responded by filing a disciplinary charge against the prisoner, alleging that the prisoner had filed a grievance on false charges. Id. This prompted prison officials to transfer the prisoner from his normal cell to a mosquito-infested, hot and humid cell where he received reduced shower and exercise privileges and could not visit the prison library. Id. The prisoner then filed a retaliatory discipline claim in court. Id. Defendants in the lawsuit argued that transfers to different cells did not constitute discipline, negating the second element of the *prima facie* case. Id. The court held that the filing of the disciplinary charge itself was sufficient to satisfy the second element. Id. at 1156.

In Cornell v. Woods, 69 F.3d 1383, 1386-88 (8th Cir. 1995), prison officials filed a disciplinary charge against a prisoner and the prisoner was transferred to a higher-security prison after he had cooperated with an internal affairs investigation at his prison implicating a prison guard. The prisoner

75

then brought suit under § 1983 alleging that the defendants had disciplined him in retaliation for exercising his constitutional right to cooperate with the IA investigation.  Id. at 1387.  Although the court acknowledged prisoners have no right to remain in a particular prison, and prison officials may transfer a prisoner for any reason or no reason, the court held defendants could not transfer a prisoner in retaliation for exercising a constitutional right.  Id. at 1387-88.  The court held the plaintiff had a constitutional right to cooperate with the internal prison investigation.  Id. at 1388.  If the cooperation in the investigation was the "but for" reason for the plaintiff's transfer to the more-secure prison, plaintiff made out a *prima facie* case of retaliatory discipline.  Id. at 1388-89.  If, however, the discipline or transfer was made because of "an actual violation of prison rules or regulations, then" the retaliatory discipline claim fails.  Id. at 1389; Santiago, 707 F.3d at 993.

Where a plaintiff engaged in behavioral infractions nine times in the month immediately preceding his transfer, and where transfers were appropriate to address behavioral problems, the plaintiff failed to prove that his exercise of his constitutional right was a "but for" cause of the transfer. Beaulieu, 690 F.3d at 1026-27.

The "causal connection [between a discipline meted out and the previous exercise of a constitutional right] is generally a jury question, . . . [but] it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury."  Beaulieu, 690 F.3d at 1025.  Timing in this regard is extremely important:  where the disciplinary action takes place

76

"almost immediately" after a defendant learns of the protected constitutional activity, there is a sufficient nexus in time to create a genuine issue of material fact as to causation. Spencer v. Jackson County, MO, 738 F.3d 907, 910-12 (8th Cir. 2013) (plaintiff removed from trustee program almost immediately after he reminded defendant of § 1983 lawsuit he filed against defendant); Santiago, 707 F.3d at 993; Haynes, 588 F.3d at 1156-57. Alternatively, where the allegedly retaliatory action takes place *before* a defendant even knows that the plaintiff exercised a constitutional right, summary judgment in favor of the defendant is appropriate. Beaulieu, 690 F.3d at 1025-26.

## 2.    Discipline—Segregation in the SHU

Both parties agree Mr. Maday was confined to the SHU for one day from January 9-10, 2017, and for a very short period of time on April 27, 2018. Mr. Maday asserts he was locked up in the SHU in retaliation for exercising his constitutional rights. The documents from Mr. Maday's administrative grievances on this subject tell a different story, however.

The constitutionally-protected activity Mr. Maday alleges provoked his lockup in the SHU was that he submitted two grievances with "PREA" implications concerning the action of a staff member, defendant herein Dennis Cropper, and physical plant conditions at MDSP. See Docket No. 1 at pp. 42-43, ¶ 143. He asserts defendants ignored his complaints and that defendant Josh Klimek locked him up in the SHU in retaliation for filing the complaints. Id. "PREA" refers to the Prison Rape Elimination Act.

Mr. Maday's filed an IRR on January 9, 2017, that the toilet stalls had no doors on them. See Docket No. 126-113. He alleged that when he emerged from the shower to dry off, unnamed homosexual inmates would blatantly masturbate in front of Mr. Maday. Id. He stated in his IRR that he had been "the victim of blatant predatory homosexual activity" and "I believe [this] to be a PREA violation."[15] Id. He requested that doors be installed on the toilet stalls. Id.

SD DOC has a policy with regard to responses by prison staff to PREA complaints. See Docket No. 128 at p. 11, ¶ 35. Pursuant to that PREA investigation policy, when an inmate makes a PREA complaint, it must be immediately investigated and the victim and abuser must be separated. Id. at pp. 11-12, ¶¶ 36-37. Prison staff are allowed to place inmates in disciplinary housing for up to 24 hours in order to separate them while investigating PREA complaints. Id. at p. 12, ¶ 38.

Defendants assert that it was pursuant to this policy that Mr. Maday was placed in the SHU for one 24-hour period. The court notes defendants' assertion is borne out by the fact that Mr. Maday's confinement in the SHU occurred immediately on the same day after he made his PREA complaint.

---

[15] Mr. Maday now attempts to disavow this statement in his affidavit in opposition to summary judgment, saying his grievance was never a PREA complaint. See Docket No. 174 at p. 101, ¶259. The constitutionality of defendants' actions are judged by the information they had at the time they acted. Mr. Maday wrote in his grievance that he was making a PREA complaint. See Docket No. 126-113. He will not be heard now to disavow that fact.

Mr. Maday was also taken to the SHU by Sergeant Tycz on another occasion on April 27, 2018.  Docket No. 94 at pp. 12, 19.  Mr. Maday was never actually placed in the SHU on this occasion, but merely in a holding cell next to the entrance to the SHU.  Id.  Even by Mr. Maday's own account, he spent only a "short time" in the holding cell and was then released.  Id.

Defendants agree this occurred, but assert it was a mistake.  See Docket No. 126 at p. 113-14.  Defendants had discovered another inmate, not Mr. Maday, was forging grievance forms and submitting them under the names of other inmates.  See Docket No. 130 at p. 13, ¶¶ 41-42.  Defendant Klimek issued an order that this other inmate be taken to the SHU.  Id.  However, there was either a misunderstanding by staff or Mr. Klimek misspoke, with the result that Mr. Maday was mistakenly taken to the SHU instead of the intended inmate.  Id. at ¶43.  When Klimek learned Mr. Maday was in the SHU, he immediately ordered him released and the other, intended inmate, placed there instead.  Id. at pp. 13-14. ¶ 44.  Mr. Maday was only in the SHU a very short period of time, only long enough for Sergeant Tycz and Lieutenant Larson to go into another room to confer with each other and then return to Mr. Maday and release him.  See Docket No. 94 at pp. 11-12,  ¶ 535.

As to the April, 2018, visit to the holding cell of the SHU, the court finds no causal nexus to any protected activity which would suggest the actions were

retaliatory.  Mr. Maday filed his PREA complaint regarding doors on toilet stalls January 9, 2017, and the SHU incident occurred 16 months later.[16] Mr. Maday never asserts a date for the PREA complaint regarding defendant Cropper.  The PREA complaints are the reason Mr. Maday alleges defendants retaliated against him.  Regardless of defendants reasons for its actions in April, 2018, there is simply not any nexus in time to the April incident and any protected activity by Mr. Maday.

Defendants do not discuss any PREA complaint made by Mr. Maday against Dennis Cropper.  Mr. Maday's complaints do not establish either the date of his complaint against Cropper nor the substance of that complaint.  See Docket No. 1 at pp. 42-43, ¶ 143.  In his response in opposition to defendants' summary judgment motions, Mr. Maday provides a few more details of his allegation.

He states Mr. Cropper groped and ogled a roommate of Mr. Maday's.  See Docket No. 174 at p. 21.  Mr. Maday states he filed a PREA complaint against Mr. Cropper on behalf of his roommate because the roommate did not want to file a complaint.  Id.  Mr. Maday filed the PREA complaint against Mr. Cropper with the South Dakota Division of Criminal Investigation ("DCI") because he thought prison staff would be unresponsive.  Id. at p. 22.  Although Mr. Maday does not give the date of his PREA complaint against Mr. Cropper, he also does not allege any retaliatory actions in the wake of filing the complaint.  Id.

---

[16] Similarly, he filed his complaint in this case in December, 2017, and the April, 2018, SHU incident occurred four months later.  This is too attenuated to give rise to an inference of retaliatory intent.

Defendants characterize this part of Mr. Maday's complaint as speculative, conclusory, and formulaic and assert it should be dismissed on summary judgment. See Docket No. 126 at pp. 109-10. It is Mr. Maday's burden to show there is a genuine issue of a material fact regarding causation between his PREA complaint about Dennis Cropper and one or both of his trips to the SHU.

After receiving Mr. Maday's response in opposition to summary judgment, the court cannot characterize his allegations as conclusory. But it fails to create a material issue of fact because (1) there is no date on the complaint so as to enable the court to determine if there is a close nexus between the protected activity and the alleged retaliation, (2) Mr. Maday fails to allege *any* retaliation following the filing of this complaint, and (3) Mr. Maday fails to establish that filing a PREA complaint on behalf of another inmate who does not desire to file such a complaint is constitutionally protected activity.[17] The court recommends granting summary judgment to defendants on both of Mr. Maday's retaliation claims based upon making PREA complaints.

---

[17] Mr. Maday attempts to create a material issue of disputed fact by showing that he was placed in the SHU after his PREA complaint about the absence of toilet stalls, but not placed in the SHU after filing his PREA complaint regarding Cropper. See Docket No. 174 at p. 103, ¶ 264. There is a very good reason for the different actions by defendants on the face of Mr. Maday's allegations: the Cropper PREA complaint did not involve any claim by Mr. Maday that he had been victimized. Instead, he claimed another inmate had been victimized. It would have defied logic for defendants to place Mr. Maday in the SHU for his own protection on such allegations because he was not alleging he was in any danger.

### 3.    Taking of the Arch Supports

Defendants do not discuss Mr. Maday's allegation that defendant Dennis Cropper retaliated against Mr. Maday by taking his arch supports for a period of 13 days in March and April, 2016.  Mr. Maday's complaints do not establish either the date of his complaint against Cropper nor the substance of that complaint.  See Docket No. 1 at pp. 42-43, ¶ 143.

It is not clear that Mr. Maday *is* asserting a retaliation claim based on the removal of his arch supports from his cell.  Although Mr. Maday uses conclusory language that Cropper's actions were retaliatory, see Docket No. 1 at p. 38, ¶ 135, there is no formal claim asserted by Mr. Maday based on these facts in the "retaliation" section of either of his complaints.  See Docket No. 1 at pp. 42-43, ¶¶ 142-143; Docket No. 94 at pp. 18-19, ¶¶ 551-554.

To the extent Mr. Maday is asserting a retaliation claim on the basis of Dennis Cropper's removal of his arch supports from his cell for 13 days, the court agrees the claim fails for lack of detail.  Without substantive information about the date of the protected activity—presumably the filing of the PREA complaint against Cropper—and the contents of that complaint, the court is unable to conclude there is any factual support for such a claim.

If the claim is based on the protected activity of filing his lawsuit in this matter, as with the mail-based claims discussed below, the alleged retaliation took place prior to the protected activity.  Mr. Maday filed his complaint December 8, 2017.  The taking of the arch supports occurred March 25, 2016, approximately 18 months before.  When the retaliation takes place before the

82

protected activity, summary judgment is appropriate on an alleged retaliation claim. Beaulieu, 690 F.3d at 1025-26. The court recommends granting summary judgment on the retaliation claim based on the taking of Mr. Maday's arch supports for 13 days.

### 4.    Censorship of Mr. Maday's Mail

Each of the acts of censorship of Mr. Maday's mail which he alleges were in retaliation for his filing this lawsuit were supported by and in conformity with SD DOC mail policy, as discussed above. The confiscation of the 2015 SI swimsuit edition magazine constituted prohibited pornography under SD DOC policy. The denial of receipt of hardcover books was also in conformity with existing SD DOC policy prohibiting inmates from receiving any hardcover books through the mail. The deprivation of the letter from Dr. Nelson written on colored paper and the nonconforming envelope from Mr. Maday's brother were also consistent with existing DOC policy.

The court notes that Mr. Maday filed his complaint in this case on December 8, 2017. See Docket No. 1. The confiscation of the February 2015 SI magazine occurred almost three years *before* Mr. Maday filed this complaint and the first denial of a hardcover book occurred in November, 2016. Unless defendants have the ability to see the future, then, these acts cannot have been in retaliation for Mr. Maday filing this lawsuit. Beaulieu, 690 F.3d at 1025-26 (summary judgment appropriate where alleged retaliatory conduct took place before plaintiff engaged in constitutionally-protected activity).

83

The other mail-related acts occurred four or five months after Mr. Maday filed his complaint herein, in March and April, 2018. This is far outside the circumstances held in Spencer, Hayes, and Santiago to create a factual question. In those cases, the retaliatory acts occurred immediately or within just a few days of the plaintiff's exercise of his constitutionally-protected acts. Spencer, 738 F.3d at 911-13; Santiago, 707 F.3d at 993; Haynes, 588 F.3d at 1156-57. The lack of a close nexus in time between the alleged retaliatory acts and Mr. Maday's constitutionally-protected activity, in addition to the fact that each of defendants' mail-related acts was in conformity with official DOC mail policy, leads the court to conclude Mr. Maday has failed to create a material question of fact preventing the entry of summary judgment. Accordingly, the court recommends granting defendants' motion for summary judgment on Mr. Maday's mail-related retaliation claims.

## H. ADA Claims

### 1. Applicable ADA Law

The ADA consists of three titles, only one of which—Title II—is applicable to Mr. Maday's claims.[18] Title II of the ADA prohibits "public entities" from excluding "qualified" disabled persons from programs, activities, or services, or otherwise discriminating against disabled persons. See 42 U.S.C. § 12132.[19] A

---

[18] Title I prohibits discrimination against disabled persons in employment. See 42 U.S.C. § 12112. Title III requires places of public accommodation operated by private entities to provide facilities that allow full and equal enjoyment of goods, services and other benefits. See 42 U.S.C. §§ 12181(6), (7), and 12182.

[19] Section 12132 provides: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be

"qualified individual with a disability" "means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." See 42 U.S.C. § 12131(2).  Congress delegated to the United States Department of Justice ("DOJ") the authority to promulgate implementing regulations for Title II of the ADA.  See 42 U.S.C. § 12134.  Cases arising under § 504 of the Rehabilitation Act are interchangeable with ADA claims arising under Title II, with the exception that § 504 claims required plaintiffs to show the additional element of receipt of federal funding by the public entity.  Gorman v. Bartch, 152 F.3d 907, 912 (8th Cir. 1998); 42 U.S.C. § 12133.

A "public entity" is defined in part as "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government."[20]  See 42 U.S.C. § 12131(1)(A) and (B).  Title II of the ADA covers state prisons.  Pennsylvania Dept. of Corrections v. Yeskey, 524 U.S. 206, 209-10 (1998) (stating "state prisons fall squarely within the [ADA's] statutory definition of 'public entity' ").

_____

excluded from participation in or be denied benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  See 42 U.S.C. § 12132.

[20] The other part of the definition of "public entity," not relevant here, is "the National Railroad Passenger Corporation, and any commuter authority."  See 42 U.S.C. § 12131(1)(C).

85

Although a state and any department of a state are "public entities" under Title II of the ADA (see Klingler v. Director, Dept. of Revenue, 433 F.3d 1078, 1080 (8th Cir. 2006)), defendants in their individual capacities do not constitute "public entities" subject to suit under Title II of the ADA. The Eighth Circuit held in an *en banc* decision that Congress' designation of liability for "public entities" under Title II of the ADA necessarily implied that there was no liability for individuals under that statute. See Alsbrook v. City of Maumelle, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (citing Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 19 (1979)). That decision has been followed by subsequent Eighth Circuit panels. See Dinkins v. Correctional Medical Servs., 743 F.3d 633, 634 (8th Cir. 2014) (*per curiam*); Baribeau v. City of Minneapolis, 596 F.3d 465, 484 (8th Cir. 2010).

Other courts have come to the same conclusion as the Eighth Circuit. See e.g. Vinson v. Thomas, 288 F.3d 1145, 1155-56 (9th Cir. 2002) (plaintiff cannot sue defendant in his individual capacity under 42 U.S.C. § 1983 for a Title II ADA violation); Lollar v. Baker, 196 F.3d 603, 610 (5th Cir. 1999) (same); Holbrook v. City of Alpharetta, 112 F.3d 1522, 1531 (11th Cir. 1997) (same); Wiesman v. Hill, 629 F. Supp. 2d 106, 111-12 (D. Mass. 2009) (holding that there is no liability for "persons" individually under Title II of the ADA, thus dismissing plaintiff's claim against employee of public housing authority); Damron v. North Dakota Com'r of Corrections, 299 F. Supp. 2d 970, 976 (D.N.D. 2004) (holding that prison officials could not be sued in their individual capacities under Title II of the ADA).

86

These holdings are consistent with the well-accepted principle that there is no individual liability under Title I of the ADA.  Alsbrook, 184 F.3d at 1005 n.8 (citing Butler v. City of Prairie Village, 172 F.3d 736, 744 (10th Cir. 1999); Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 1996); EEOC v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1280-82 (7th Cir. 1995)).

However, a plaintiff may assert a Title II claim for injunctive relief against a state employee in his or her official capacity.  The Eleventh Amendment does not bar the granting of injunctive relief.  Bradley v. Arkansas Dept. of Educ., 189 F.3d 745 (8th Cir. 1999), rev'd in part, Jim C. v. Arkansas Dept. of Educ., 235 F.3d 1079 (8th Cir. 2000); Missouri Child Care Assn. v. Cross, 294 F.3d 1034 (8th Cir. 2002).

Claims based on medical treatment decisions, including claims that a defendant failed to properly diagnose or treat a condition, cannot form the basis of an ADA claim under Title II of that act nor under the Rehabilitation Act.  Dinkins, 743 F.3d at 634; Burger v. Bloomberg, 418 F.3d 882, 883 (8th Cir. 2005) (per curiam).  However, claims based on denial of meals or adequate housing based on a plaintiff's disability can form the basis for viable ADA and RA claims.  Dinkins, 743 F.3d at 634-35 (citing Yeskey, 524 U.S. at 210; Jaros v. Ill. Dept. of Corr., 684 F.3d 667, 672 (7th Cir. 2012)).  Based on Dinkins, the court recommends dismissal of all ADA claims against each defendant whose job is to render medical care to inmates:  Michael Joe Hanvey, physicians' assistant; Dr. Stephan Schroeder; Misty Tolsma-Hanvey, Nursing Supervisor; Lindsey Rabbass, nurse; Robin Myer, nurse; Candice Fejfar, nurse; Dayna

87

Klawitter, nurse; and unknown employees of the SD Department of Health. Dinkins, 743 F.3d at 634.

Based on the above law, all ADA claims asserted by Mr. Maday against all defendants in their individual capacities should be dismissed. There is no individual liability under the ADA. Dinkins, 743 F.3d at 634; Alsbrook, 184 F.3d at 1005 n.8 The remainder of this section deals with Mr. Maday's claims against defendants in their official capacities.

Mr. Maday must show three elements to make out a *prima facie* case under Title II of the ADA: (1) he is an individual with a disability, (2) he was otherwise qualified for the benefit in question, and (3) he was denied the benefit based upon disability discrimination. Randolph, 170 F.3d at 858; Gorman, 152 F.3d at 911-12. In response, defendants may raise an affirmative defense that the accommodation requested by Mr. Maday would constitute an undue burden, "requiring 'a fundamental alteration in the nature of a service, program, or activity or in undue financial or administrative burdens.' " Gorman, 152 F.3d at 912 (quoting 28 C.F.R. § 35.150(a)(3)).

Before a plaintiff can receive compensatory money damages under Title II, he must show intentional discrimination on the basis of disability. Meagley v. City of Little Rock, 639 F.3d 384, 389 (8th Cir. 2011). This requires Mr. Maday to show that defendants were deliberately indifferent to his ADA rights. Id. Prospective injunctive relief does not require this showing. Id. Punitive damages are not available under the ADA. Id. at 390 (citing Barnes v. Gorman, 536 U.S. 181, 189 (2002)).

## 2.    The <u>Turner</u> Analysis Applies in Some Fashion to ADA Claims

The Supreme Court resolved a question upon which the lower circuit courts had disagreed when it held in 1998 that the ADA applied to state prisons. <u>Yeskey</u>, 524 U.S. at 212.  The Court left open many questions, however, such as the constitutionality of applying the ADA to state prisons[21] and the question of how, if at all, the <u>Turner</u> analysis applies to ADA claims in the prison context.

Virtually all circuit courts to address the issue have concluded that the <u>Turner</u> analysis continues to inform judicial review of state prison policies when ADA claims are brought, but the approach varies by circuit.  <u>See</u> Brian Lester, <u>The ADA and the Exclusion of Inmates from Services in Prisons:  A Proposed Analytical Approach Regarding the Appropriate Level of Judicial Scrutiny of a Prisoner's ADA Claim</u>, 79 N.D. L. Rev. 83, 95 (2003).

The Eighth Circuit, while not citing to <u>Turner</u>, noted that whether a requested accommodation is reasonable or imposes an undue burden on defendants should be considered in light of "the heightened security concerns of a prison." <u>Randolph</u>, 170 F.3d at 859.  Thus, the <u>Turner</u> analysis appears to

---

[21] The Court subsequently held that Title II's abrogation of state sovereign immunity as to state prisons is valid for actions for money damages insofar as the plaintiff's Title II allegations also constitute a violation of the Eighth Amendment's prohibition against cruel and unusual punishment (deliberate indifference), as incorporated in § 5 of the Fourteenth Amendment.  <u>United States v. Georgia</u>, 546 U.S. 151, 158-59 (2006).  Title II's constitutional scope may be broader than claims that also encompass the Fourteenth Amendment, but it stretches at least that far.  <u>Id.</u>  Defendants herein have not attempted to attack the constitutionality of Title II as it applies in this case to Mr. Maday or to them.  Accordingly, this court need not address the ultimate constitutional parameters of the ADA in this context.

be incorporated by the Eighth Circuit in the "undue burden" affirmative defense.  Id.

Interpreting the Rehabilitation Act, the Ninth Circuit explicitly invoked Turner when it held a prisoner's *statutory* rights, no less than his *constitutional* rights, "must be considered in light of the reasonable requirements of effective prison administration."  Gates v. Rowland, 39 F.3d 1439, 1446-47 (9th Cir. 1994).  The court explicitly held that the four-part Turner test applied to a prisoner's Rehabilitation Act claim.  Id.  A subsequent Eighth Circuit decision relied on Gates and stated "District courts should consider the factors articulated in Turner when reviewing ADA/RA claims."  Kutrip v. City of St. Louis, 329 Fed. Appx. 683, 684 (8th Cir. 2009) (citation omitted) (unpub'd).[22]

Interpreting Kutrip and Randolph together, the court concludes that the Turner factors should be considered when evaluating defendants' affirmative defense that an accommodation presents an undue burden in the prison setting.  See also Duffy v. Riveland, 98 F.3d 447, 456 (9th Cir. 1996); Onishea v. Hopper, 171 F.3d 1289, 1300 (11th Cir. 1999) (*en banc*); Crawford v. Indiana Dept. of Corrections, 115 F.3d 481, 487 (7th Cir. 1997) (holding whether an accommodation is an undue burden is relative to circumstances, and the circumstances of prison are different from that of a school, factory, or office), abrogated on other grounds, Erickson v. Bd. of Governors of State Colleges,

---

[22] As of January 1, 2007, the Federal Rules of Appellate Procedure provided no circuit court of appeals could prohibit the citation of opinions designated as "unpublished."  See FED. R. APP. P. 32.1.  This rule would have been well established by the time the Eighth Circuit panel issued its opinion in the Kutrip case in 2009.

207 F.3d 945 (7th Cir. 2000).  This approach is supported by the regulations implementing Title II, which provide that a public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities if such safety requirements are based on actual risks, not mere speculation, stereotypes, or generalizations.  See 28 C.F.R. § 35.130(h). Appropriate considerations are security or safety concerns and cost.  Randolph, 170 F.3d at 858; Duffy, 98 F.3d at 456; Onishea, 171 F.3d at 1300.

### 3.    Applying the ADA and Turner to Mr. Maday's Claims

#### a.    Individual with a Disability

Defendants argue that Mr. Maday has not shown he is "a qualified person with a disability."  Specifically, they assert neither diabetes nor respiratory impairments are *per se* disabilities under the ADA and that Mr. Maday is required to show his diabetes and respiratory impairments are of such severity that it affects one or more major life activities.  See Docket No. 126 at pp. 61-64, 69.  As to his broken metatarsal bone and plantar fasciitis, defendants argue those conditions were temporary and not of sufficient duration to be considered a disability under the ADA.  Id. at pp. 70-74.

The Supreme Court, in a 1999 decision under Title I of the ADA, rejected the Equal Employment Opportunity Commission's ("EEOC") regulations implementing the ADA.  Sutton v. United Air Lines, Inc., 527 U.S. 471, 483-84 (1999).  The EEOC had promulgated regulations indicating whether one's impairment substantially limited one's major life activities should be judged in their uncorrected, unmedicated, or unmitigated state.  Id. at 483.  In

91

explaining why it rejected the EEOC's approach, the Court noted a "diabetic whose illness does not impair his or her daily activities would therefore be considered disabled simply because he or she has diabetes.  Thus, the [EEOC] approach would create a system in which persons often must be treated as members of a group of people with similar impairments, rather than as individuals.  This is contrary to both the letter and the spirit of the ADA."  Id. at 483-84.  The Sutton Court held that impairments should be evaluated *after* medication or mitigation/assistive devices are taken into consideration and only then, if the impairment still substantially limited a major life activity should the individual be considered "disabled."  Id.

Relying on Sutton, the Eighth Circuit held diabetes is not a *per se* disability; instead, a plaintiff under the ADA must demonstrate that his diabetes substantially limits one or more major life activities.  Orr v. Wal-Mart Stores, Inc., 297 F.3d 720, 724 (8th Cir. 2002) (citing Sutton, 527 U.S. at 482-83).  The court held if one's physical or mental impairment is corrected by medication or other measures, the impairment is not a "disability" that substantially limits a major life activity.  Orr, 297 F.3d at 724 (citing Sutton, 527 U.S. at 482-83).  In addition, a "disability" must actually substantially limit a major life activity—courts may not consider whether the condition "might," "could," or "would" be substantially limiting if mitigating measures were not taken.  Orr, 297 F.3d at 724 (citing Sutton, 527 U.S. at 482).  "Most disabilities from which people suffer, including diabetes, do not have a substantial enough effect on their major life activities."  Orr, 297 F.3d at 724 (citing Berg v. Norand

Corp., 169 F.3d 1140, 1145 (8th Cir. 1999) (quoting Dalton v. Subaru-Isuzu Auto, Inc., 141 F.3d 667, 675 (7th Cir. 1998)).

But the Sutton and Orr decisions are not controlling case law any longer. That is because Congress passed the 2008 ADA Amendments, expressly legislatively overturning Sutton and Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184 (2002).[23]  See ADA Amendments Act ("ADAAA") of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008).  Congress was unhappy with what it viewed to be the Court's too-narrow construction of the ADA.

 Congress found the Court's decisions to be "inconsistent with congressional intent, by expressing too high a standard," for ADA plaintiffs to meet.  ADA Amendments Act of 2008 § 2(a)(8).  Congress declared the holdings in Toyota, Sutton, and other cases "narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect."  Id. § 2(a)(4).

In the 2008 ADA Amendments, Congress elaborated on the definition of "disability" by stating the term was to "be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter."  42 U.S.C. § 12102(4)(A).  Congress specified "[t]he term 'substantially limits' shall be interpreted consistently with the findings and

---

[23] The Supreme Court in Toyota held that "substantially limited" means that an individual's disability "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives.  The impairment's impact must also be permanent or long term."  Toyota, 534 U.S. at 198.

purposes of the ADA Amendments Act of 2008." Id. § (4)(B).  Those findings stated that:

> Congress recognized that physical and mental disabilities in no way diminish a person's right to fully participate in all aspects of society, but that people with physical or mental disabilities are frequently precluded from doing so because of prejudice, antiquated attitudes, or the failure to remove societal and institutional barriers.

ADA Amendments Act of 2008 § 2(a)(2).

Under post-2008 law, the ADA provides a qualifying disability is any "physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A); 28 C.F.R. § 35.108(a)(1)(i).  The DOJ regulations implementing Title II define "physical or mental impairment" as including "diabetes."  See 28 C.F.R. § 35.104.  Eating and the operation of the "digestive" system are "major life activities."  See 42 U.S.C. § 12102(2); 28 C.F.R. § 35.108(b)(2).

In a complete reversal of Sutton, Congress in 2008 passed a statutory definition of disability that required courts to assess the impairment "without regard to the ameliorative effects of mitigating measures such as medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies . . ." See 42 U.S.C. § 12102(4)(E)(i)(I).  The DOJ followed suit when it promulgated identical regulations for Title II.  See 28 C.F.R. § 35.108(d)(4)(i).

94

Congress and the DOJ have emphasized that undue analysis and restriction should not be placed on the issue whether an individual is disabled, especially with regard to Title II, where the emphasis is to be placed on whether public entities have complied with their obligations under the ADA.  See ADA Amendments Act of 2008, PL 110-325, Sept. 25, 2008, 122 Stat 3553, § 2(b)(5) (stating that "the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and . . .the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."); 28 C.F.R. § 35.108(d)(1)(ii).

Accordingly, the DOJ has set forth some impairments which will, at a minimum, always substantially limit the indicated major life activities.  Id. at (d)(2)(iii) (these are deemed "predictable assessments").   Diabetes is listed among these "predictable assessments" as always substantially limiting the endocrine system.  Id. at (d)(2)(iii)(H).  Courts defer to an agency's reasonable interpretations of a statue.  Federal Exp. Corp. v. Holowecki, 552 U.S. 389, 397 (2008) (deferring to EEOC's regulations implementing the Age Discrimination in Employment Act).  Here, the court finds the DOJ regulations implementing Title II of the ADA track very closely—in some cases are verbatim—with the 2008 ADA Amendments enacted by Congress.  Accordingly, they are entitled to some deference.

Defendants do not dispute that Mr. Maday suffers from diabetes. Therefore, under the new DOJ regulations implementing Title II post-2008 ADA

95

Amendments, the court finds Mr. Maday has sufficiently demonstrated he is an individual with a disability. The court does not definitively hold that the DOJ regulations are binding. But for purposes of ruling on defendants' summary judgment motions, the court assumes they are.

This is precisely the result reached by the district court in <u>Richards v. Minnesota</u>, 2016 WL 7007487 (D. Minn. Nov. 29, 2016). Richards was an inmate at a Minnesota state correctional facility who brought claims under the ADA and § 504 of the RA. <u>Id.</u> at *1. Richards suffered from celiac disease and diabetes and asserted defendants failed to provide him with reasonable accommodations in the form of a diet appropriate to his impairments. <u>Id.</u> at *2. At issue in the court's opinion was whether Richards should be able to assert claims for failure to provide reasonable accommodations under both § 1983 and the ADA/RA. <u>Id.</u> at *4. If Congress had enacted a comprehensive remedial scheme under the ADA/RA, then that would evince a Congressional intent to foreclose resort to § 1983 for the same claims. <u>Id.</u>

In evaluating this issue, the court interpreted the ADA/RA to determine if Richards' claims were covered by those acts and, if so, if the remedial scheme under those acts was comprehensive. <u>Id.</u> The court noted the ADA defines "disability" to include any "physical or mental impairment that substantially limits one or more major life activities." <u>Id.</u> at *5. The regulations promulgated by the DOJ define "physical or mental impairment" to include "diabetes." <u>Id.</u> (citing 28 C.F.R. § 35.104). Major life activities include eating and the operation of the digestive system. <u>Id.</u> (citing 42 U.S.C. § 12102(2)). The court

96

concluded Richards' claims were covered by the ADA/RA and, as such, his exclusive remedy must derive from those acts, not § 1983.  Id.

Following the 2008 ADA Amendments Act, Congress and, by extension, the DOJ in its regulations, emphasized that the focus of courts' analysis of ADA claims should be on defendants' responses to a request for accommodation.  Very little analysis should be necessary to determine an individual was disabled.  See ADA Amendments Act of 2008, PL 110-325, Sept. 25, 2008, 122 Stat 3553, § 2(b)(5); 28 C.F.R. § 35.101(b) (both stating the primary purpose of the 2008 amendments was to make it easier for disabled persons to obtain protection under the ADA and the primary focus should be on whether the public entities have complied with their ADA obligations rather than on whether an individual meets the definition of "disability," which should not require extensive analysis).  The DOJ further states if an impairment is one—like diabetes—deemed a "predictable assessment," it should be "unnecessary to conduct an analysis involving most or all of the facts related to condition, manner or duration."  See 28 C.F.R. § 35.108(d)(2)(iv).  Such impairments "by their inherent nature should be easily found to impose a substantial limitation on a major life activity, and for which the individualized assessment should be particularly simple and straightforward."  Id.

Similarly, the DOJ regulations eschew extensive analysis of whether an impairment substantially limits a major life activity.  See 28 C.F.R. § 35.108(c)(2) and (d)(1).  It is clear under these regulations that Congress and the DOJ intended that diabetes be considered a disabling impairment.

97

Therefore, this court so concludes for purposes of the instant summary judgment motions.

Defendants cite Quarles v. Maryland Dept. of Human Resources, 2014 WL 6941336 at *3 (D. Md. Dec. 5, 2014), for the proposition that—even post-2008 ADA Amendments--diabetes is not a *per se* disabling condition under the ADA. Quarles does not stand for that proposition. First, the Quarles court mentions the 2008 ADA Amendments in a footnote, but stated the court was "unable to locate a federal trial or appellate court decision applying the post-ADAAA version of the ADA to a disability discrimination claim with diabetes as the qualifying disability." Id. at *4 n.8. Apparently, then, the court simply applied pre-2008 law indiscriminately.

The Quarles court relied upon other court decisions in support of its holding that pre-date the 2008 ADA Amendments, with no acknowledgement that those cases may have been based on precedent that was no longer good. Quarles, 2014 WL 6941336 at *3 (citing Scheerer v. Potter, 443 F.3d 916, 919 (7th Cir. 2006); Miller v. Verizon Commc'ns, Inc., 474 F. Supp. 2d 187, 197 (D. Mass. 2007); Fraser v. Goodale, 342 F.3d 1032, 1041-42 (9th Cir. 2003)).

The two cases cited by Quarles which post-date the 2008 ADA Amendments were themselves based on precedent which was no longer good. Gonzalez v. Sears Holding Co., 980 F. Supp. 2d 170 (D.P.R. 2013), cited by the Quarles court, recited and followed the standard from Toyota that Congress expressly overruled in the 2008 amendments: that an ADA plaintiff must show that his physical or mental impairment limited the plaintiff "to a substantial

98

extent." Gonzalez, 980 F. Supp. 2d at 183-84 (relying on Carroll v. Xerox Corp., 294 F.3d 231, 238 (1st Cir. 2002);  and Toyota Motor Mfg., Ky., Inc., 534 U.S. at 198)).  The First Circuit's decision in Carroll is itself no longer good law as it was based on Toyota.  Carroll, 294 F.3d at 238.

The other post-2008 case cited by the Quarles court was Schneider v. Giant of Maryland, LLC, 389 Fed. Appx. 263, 268 (4th Cir. 2010) (*per curiam*) (unpub'd).  The Schneider court quoted from Sutton in holding that the effect of plaintiff's diabetes must be judged after correction with medication.  Id.  Of course, as discussed above, this is the precise point made by the Sutton Court that Congress expressly overruled in the 2008 ADA Amendments.

The Schneider court also explicitly noted the 2008 ADA Amendments had become effective *after* the date the plaintiff in that lawsuit filed her complaint.  Id. at 267 n.3.  Therefore, the Schneider court explicitly refused to apply the 2008 ADA Amendments in that case because doing so would give the amendments retroactive effect, something for which there was no support in the legislation.  Id.

Defendants also cite Lee v. District of Columbia, 19 F. Supp. 3d 281 (D.D.C. 2014), for its holding that diabetes is not a *per se* disability.  However, Lee was based on the plaintiff's firing from his job in 2008, so those events predated the 2008 ADA Amendments (which became effective January 1, 2009), and the Lee court explicitly and extensively relied on Sutton.  Lee, 19 F. Supp. 3d at 284, 286-87.  Finally, the Lee court never mentioned or tried to apply the 2008 ADA Amendments.

99

In summary, then, the Quarles decision was based on law that was no longer good precedent at the time Quarles was decided and the decision itself never acknowledges the sea-change brought about by the 2008 ADA Amendments nor tries to apply the amendments. Quarles does not provide support for defendants' position that Mr. Maday's diabetes is not a disabling condition. The Lee decision appears to have been based on conduct that predated the ADA Amendments and, therefore, did not involve those amendments.

In his complaints, Mr. Maday asserted several conditions rendered him disabled under the ADA. In his response in opposition to defendants' summary judgment motions, he addresses solely his diabetes. See Docket No. 173 at p. 6. The court takes this to be a waiver on Mr. Maday's part of any assertion of disability based on any condition other than diabetes. However, to the extent defendants address these other conditions, the court responds to defendants' arguments.

Defendants argue Mr. Maday's broken metatarsal and plantar fasciitis were transitory conditions which do not qualify as a disability. But the DOJ regulations provide otherwise. A transitory disability (lasting six months or less), cannot form the basis of a claim that one was discriminated against because a public entity "regarded one" as being disabled. See 28 C.F.R. § 35.108(f)(2). However, where a plaintiff asserts he is "actually" disabled, not just "regarded as" disabled, the transitory provision does not apply. See 28 C.F.R. § 35.108(d)(1)(ix). Instead, a transitory impairment lasting less than six

months "can be substantially limiting within the meaning of this section for establishing an actual disability." Id. Therefore, defendants' arguments that Mr. Maday's broken metatarsal and plantar fasciitis cannot be considered disabling impairments because they were transitory is misplaced. In any case, Mr. Maday need only prove one disabling condition and, in asserting his diabetes, he has met his burden on the first element of the *prima facie* case.

Mr. Maday alleged in his complaint he suffered impairments from a "respiratory disorder" and "hypertension," but he provides no details of those conditions or how they affect him. He identifies no reasonable accommodations he believes should be made for these conditions. For the respiratory condition, he does not even state *what* the condition is. The court notes there is an entire spectrum of respiratory ailments from which an individual may suffer ranging from mild asthma which affects a person only very rarely to acute emphysema or chronic obstructive pulmonary disease. Mr. Maday makes no mention of requiring supplemental oxygen or inhalers to assist him with breathing. In addition to the lack of details in the affidavits, Mr. Maday does not assert he is disabled due to respiratory disorders or hypertension in his response to defendants' summary judgment motion. See Docket No. 173. He does clarify in his affidavit that his respiratory disorder is obstructive sleep apnea, but he does not address whether or how that condition affects a major life activity. See Docket No. 174 at p. 75. Accordingly, the court does not consider these alleged impairments further in the below analysis.

### b.   Qualified for the Benefit in Question

Defendants do not dispute or even address whether Mr. Maday is qualified for recreation, diabetic socks and shoes, or a diabetic diet.  They do dispute whether he is qualified for mobility-impaired showers or lay-in trays. As to Mr. Maday's mobility-related requested accommodations (receiving meals and medication on unit—"lay-in"), defendants instead assert that Mr. Maday is simply *not* mobility impaired.  <u>See</u> Docket No. 138 at p.32, ¶147.  They assert Mr. Maday is not confined to a wheelchair or otherwise unable to walk.  <u>Id.</u>

### c.   Denied the Benefit Based upon Disability Discrimination

Nowhere in Mr. Maday's voluminous complaints does he allege that defendants violated his ADA rights because of intentional discrimination against Mr. Maday on the basis of his disability.  <u>See</u> Docket Nos. 1 & 94.  In responding to defendants' summary judgment motions, he adduces no facts in support of such an assertion.  Accordingly, the court recommends granting defendants' summary judgment motions on all claims for money damages under the ADA.  <u>Meagley</u>, 639 F.3d at 389-90.  Likewise, the court recommends granting summary judgment on Mr. Maday's punitive damages claim to the extent that claim is based on ADA violations.  <u>Id.</u> at 390.  Punitive damages are not allowed under the ADA.  <u>Id.</u>

Mr. Maday's failure to allege or adduce sufficient facts to create a genuine issue of material fact as to intentional discrimination does not, however, dispense with his request for prospective injunctive relief under the

102

ADA.  Id. at 389-90.  Accordingly, the court analyzes the reasonable

accommodation prong.  This analysis applies solely to injunctive relief.

### d.    Reasonable Accommodation/Undue Burden

### i.    Recreation

Regarding Mr. Maday's allegations about use of recreational facilities,

defendants argue Mr. Maday has several alternative places and times for

engaging in recreation and that, therefore, they have provided reasonable

accommodation for Mr. Maday's alleged disabilities.  See Docket No. 126 at

pp. 64-68.

Mr. Maday was required to attend 10 a.m. daily blood glucose draws for

his diabetes.  See Docket No. 1 at p. 33, ¶ 123; p. 43, ¶145.  Ten in the

morning was also the time for Mr. Maday's unit to enjoy recreation.  Id.

Defendants offered to move the blood sugar checks to 11:05 a.m. so that

inmates such as Mr. Maday could attend recreation at their regularly-

scheduled time.  See Docket No. 138 at pp. 32-33; ¶ 149; Docket No. 130 at

pp. 9-10, ¶¶ 28-30.

In addition, defendants assert that Mr. Maday began work as a "shop

worker" in "automotive" at MDSP on January 22, 2018.  See Docket No. 130 at

pp. 10-11, ¶¶ 31-32.  Therefore, he is no longer free to attend morning

recreation at either 10 a.m. or 11:05 a.m.  Id.  However, for inmates such as

Mr. Maday who work during the day, MDSP provides the opportunity to attend

evening recreation sessions.  Id.  In addition, MDSP makes "off unit recreation"

available to inmates on weekends and holidays.  Id. at p. 11, ¶ 33.  Each

housing unit has an outside recreation area located in front of the unit that is available to inmates several hours a day without restriction.  Id.

Mr. Maday has alleged he is unable to use the outdoor recreation area due to uneven rocky terrain and broken concrete sidewalks.  However, the area referenced by Mr. Maday in his complaint is no longer used for recreation at MDSP.  See Docket No. 130 at pp. 11-12, ¶¶ 34-35.  Instead an area with grass and new concrete walkways is used.  See Docket Nos. 126-91 to -93 (photos depicting recreation area).  This area provides smooth level surfaces for walking.  Id.

Finally, in addition to all these opportunities for recreation, the MDSP also has an indoor gym available to all inmates during winter months or when the outside recreation sessions are moved to the Armory due to inclement weather.  See Docket No. 130 at p. 12, ¶ 36.  Although Mr. Maday alleges "medical staff" denied him access to the gym, this was only during a short period of time when he had a broken metatarsal and medical staff prescribed no weight-bearing on his foot.  See Docket No. 138 at p. 33, ¶¶151-54.

Mr. Maday asserts he should have been allowed to use the handicap recreation area during the time frame when he was in a walking cast/boot.  See Docket No. 1 at p. 33, ¶125.  Defendants assert Mr. Maday is not "handicapped" and is therefore not eligible to use the handicapped recreation area.  See Docket No. 138 at p. 34, ¶155.  The court need not resolve the issue whether Mr. Maday was "handicapped" while he was using a walking cast/boot.  The only remedy left to Mr. Maday in association with his ADA

claims is prospective injunctive relief.  That request for injunctive relief is moot as to use of the handicap recreation area because Mr. Maday is no longer in a walking cast/boot.

Defendants assert the DOJ conducted an on-site inspection of the MDSP in December, 2016, to ensure the MDSP was complying with the ADA in terms of its physical facilities.  See Docket No. 127 at p. 17, ¶58.  The only deficiency noted by the DOJ in connection with this inspection was that in the recreation yard adjacent to Harmon Hall there was not an accessible route to the picnic area.[24]  Id. at pp. 17-18, ¶ 59.  The DOJ did not find any ADA violations associated with rocky or uneven terrain.  Id.

Because the only remedy available to Mr. Maday at this point is prospective injunctive relief (because he has not shown intentional discrimination), the court finds his allegation based on lack of access to recreation time/facilities is now moot.  He admits in his affidavit in opposition to summary judgment that his job prevents him from attending morning recreation; he also admits he has access to recreation in the evenings "if [evening] recreation is not cancelled as is often the case."  See Docket No. 174 at p. 77, ¶ 173.  Mr. Maday offers no specifics about how often evening recreation is cancelled.  Mr. Maday's allegation that the uneven terrain of the recreation area is unsuitable for him is also moot.  Meagley, 639 F.3d at 387 (finding plaintiff's claim for injunctive relief under Title II against a zoo was

---

[24] The court infers this means a wheelchair- or handicap-accessible route.

moot where the zoo fixed the physical condition that impaired plaintiff's access to the zoo prior to trial).

Finally, Mr. Maday raises in his affidavit a new allegation that the recreation yards are so crowded by inmates that he is unable to run or perform calisthenics.  See Docket No. 174 at p. 77.  The court will not allow Mr. Maday to amend the claims asserted in his complaints by adding completely new allegations in his affidavit.

As an alternative holding to this court's mootness analysis, the court finds defendants provided Mr. Maday with reasonable accommodations for recreation.  An ADA plaintiff is entitled to reasonable accommodations, which may not always be the plaintiff's preferred or ideal accommodations.  Griffin v. United Parcel Serv., Inc., 661 F.3d 216, 224 (8th Cir. 2011); Huber v. Wal-Mart Stores, Inc., 486 F.3d 480, 484 (8th Cir. 2007).  Here, the multiple alternative opportunities defendants provide to Mr. Maday for recreation constitute reasonable accommodations.

### ii.    Diabetic Diet

Defendants assert, supported by appropriate affidavit, that prison health services recommended a 2400 calorie diabetic diet and weight loss for Mr. Maday on February 3, 2016.  See Docket No. 138 at p. 14, ¶ 62; Docket No. 126-49.  Defendants assert no complaints were received by defendants from Mr. Maday concerning the recommended diet until February 4, 2017.  See Docket No. 138 at p. 14 at ¶ 63; Docket No. 126-51 at p. 2.  He maintains he

106

complained repeatedly when he was getting blood sugar checks.  See Docket No. 174 at p. 50, ¶ 86.

Both parties agree on February 4, 2017, Mr. Maday told health services he had not been receiving his 2400-calorie ADA diet that was prescribed for him.  Id.  Health services asked if Mr. Maday would like them to make sure he received this diet.  Id.  Mr. Maday responded he would just go back on a regular diet and "just pick and choose what he needs to eat."  Id.  In his affidavit in opposition to summary judgment, Mr. Maday admits he rejected the diabetic diet (he says on May 4, 2015), because it was the same meal every day and, in his view, was not palatable and needed more salt.  See Docket No. 174 at p. 48, ¶84.

Between February 4, 2017, and the filing of this lawsuit on December 8, 2017, although Mr. Maday was seen multiple times by health services, he never again complained to health services about his diet or requested his diabetic diet be reinstated.  See Docket No. 138 at p. 14, ¶ 66.  Defendants assert based on these facts they offered reasonable accommodation to Mr. Maday in the form of a recommended diabetic diet and an offer from health services to follow up with the food providers to ensure Mr. Maday was receiving that diet. Mr. Maday rejected the offered accommodation, expressing his preference to have a regular diet and to self-select foods appropriate for his diabetes. Accordingly, defendants seek summary judgment on the grounds they abided by their duty under Title II of the ADA to provide reasonable accommodation for Mr. Maday concerning his diabetic diet.  The court agrees.

107

An exhibit submitted by Mr. Maday in support of his opposition to defendants' summary judgment motion actually supports defendants' position. In 2017, the SD DOC hired an independent registered dietician to conduct an investigation and survey of the food provided at South Dakota's prisons. See Docket No. 173-1 at pp. 33-56. This dietician not only reviewed menus provided by MDSP (and other prisons) food providers, but the dietician also conducted unannounced surprise visits on at least two occasions to each prison to personally observe the food that was being served. Id.

It is clear from the dietician's report that the "heart healthy" tray is synonymous with a "diabetic tray"—the dietary requirements of each are equated. Id. at pp. 40, 55. The dietician noted specifically that for a diabetic/heart healthy diet, a certain recommended number of carbohydrates was necessary. Id. Although the average carbohydrates served with regard to diabetic/heart healthy menus was appropriate, there was individual variation in the meals. Id. The dietician recommended an itemized carbohydrate count be provided as to each meal so inmates could track their daily carbohydrate counts. Id. This negates Mr. Maday's assertion that he was being served meals where carbohydrates totaled 70-80 percent of his total calories with insufficient protein. See Docket No. 174 at p. 49, ¶ 84. The only other criticism relevant to Mr. Maday's complaint noted in the independent dietician's report was that the amount of sodium in all meals served at MDSP

108

was high and the dietician recommended serving less processed meats to address this issue.[25]  See Docket No. 173-1 at pp. 33-56.

Thus, this independent report verifies that MDSP offers its inmates a diet that is appropriate for diabetics—the heart healthy diet.  This was confirmed in 2017, the very time frame Mr. Maday complains about.  That diet was available to Mr. Maday.  He refused it.  Accordingly, summary judgment should be granted defendants on his ADA diabetic diet claim.

### iii.        Diabetic Shoes and Socks

Defendants provided Mr. Maday with the diabetic shoes he specifically requested—New Balance shoes.  Furthermore, they immediately attempted to provide alternate forms of accommodation in the form of three different pairs of wider shoes over the course of Mr. Maday's first year in the South Dakota prison system.  The court concludes defendants satisfied their obligation under the ADA to reasonably accommodate Mr. Maday's diabetes and related feet conditions.

Defendants also provided Mr. Maday with the diabetic socks he requested, though not the specific "Dr. Comfort" brand of socks he wished.  Furthermore, Mr. Maday admitted he had at least one pair of diabetic socks that was the right size.  When Dr. Adams examined the fit of Mr. Maday's

---

[25] The dietician cast a skeptical eye on the many claims at both men's prisons of special dietary, allergy, and religious food needs.  The percentage of inmates claiming such special needs within the South Dakota men's prisons far exceeded the number of such special dietary needs in the population at large.  The dietician suggested reviewing these many claims with medical and religious staff to verify their authenticity.  See Docket No. 173-1 at pp. 33-56.

diabetic socks, he concluded the socks were the correct size for Mr. Maday. The reason Mr. Maday was experiencing swelling was because of a condition called dependent edema.  Dr. Adams told Mr. Maday that TED stockings were the appropriate antidote for the type of swelling he was experiencing. Dr. Adams offered to prescribe TED hose for Mr. Maday, but Mr. Maday rejected Dr. Adams' offer.  The court finds defendants satisfied their obligation to provide a reasonable accommodation in the form of appropriate hosiery for Mr. Maday's diabetic feet.

### iv.    Mobility-Impaired Showers, Lay-In Trays, Etc.

Defendants assert Mr. Maday is not mobility impaired, as evidenced by his desire to have access to recreational facilities to walk, run, and perform calisthenics.  Although defendants assert Mr. Maday is not mobility-impaired *now*, he clarifies in his affidavit that he is not currently seeking accommodations on this basis.  <u>See</u> Docket No. 174 at p. 76, ¶169.  Instead, he alleges he was wheelchair bound on two separate occasions in the past.  <u>Id.</u>  It is for defendants' alleged failure to accommodate him during these past occasions that Mr. Maday asserts this part of his ADA claim.  <u>Id.</u>

During those temporary periods, defendants provided Mr. Maday with a cam walker boot, a wheelchair, crutches, a splint, and several discrete periods when he was allowed lay-in trays on his unit.  Because Mr. Maday is no longer mobility-impaired, however, and because he is not entitled to compensatory money damages (because he has not shown intent to discriminate on the basis of disability), the court finds his request for injunctive and declaratory relief on

this basis is moot.  See Meagley, 639 F.3d at 387 (finding plaintiff's claim for injunctive relief under Title II against a zoo was moot where the zoo fixed the physical condition that impaired plaintiff's access to the zoo prior to trial).

Mr. Maday seeks an injunction requiring defendants to install doors on toilet stalls and erect privacy curtains for all showers.  See Docket No. 1 at p. 47, ¶ 157.  It is not clear whether Mr. Maday seeks this injunctive relief in connection with his ADA claim.  If so, the court recommends denying such relief.  Nowhere does Mr. Maday connect why doors and curtains are necessary or reasonable accommodations for any disability.

### 4.    Injunctive Relief & October 23, 2018 Settlement Agreement

Neither party discusses this, but for the sake of presenting a complete picture of the ADA at MDSP, the court takes judicial notice of a comprehensive and far-reaching settlement agreement entered into between the South Dakota Department of Corrections (SD DOC) and the United States Department of Justice (DOJ) on October 23, 2018.  See https://www.ada.gov/sd_sa.html, last checked March 1, 2019.  This agreement was based on on-site investigations by the DOJ of both MDSP and the South Dakota State Penitentiary (SDSP).  Id. at II.  The settlement agreement covers ADA enforcement at both prisons.  Id.

The settlement agreement between the SD DOC and the DOJ lasts for three years, until October, 2021.  Id. at IX.A.  The agreement does not supplant—or enlarge—individuals' rights under the ADA nor is any person considered a third-party intended beneficiary of the agreement.  Id. at IX.L. Nevertheless, this court would be hard-pressed to envision or put into place

111

injunctive relief that was more effective than the terms of this settlement agreement.

Under the agreement, the SD DOC agrees to create and implement a special grievance policy and procedure especially for disability-related claims. Id. at V.B.  The SD DOC must post the grievance procedure at various locations at both prisons and amend the inmate grievance procedure handbook to include a description of the ADA grievance process.  Id. at VI.A.

The SD DOC agrees to hire a Disability Coordinator for each of the two prisons.  Id. at V.A.  That Disability Coordinator is paid for by the SD DOC and reports directly to the warden of each prison.  Id.  The SD DOC must provide those coordinators with sufficient authority and resources to perform the tasks required by the agreement, including coordinating inmate requests for accommodations on account of disabilities, and resolving inmate ADA complaints.  Id.

The agreement also requires the SD DOC to hire an Independent Licensed Architect at SD DOC expense.  Id. at IV.A.1.  The architect is tasked with reviewing compliance with ADA and the architectural provisions of the agreement as well as all other alterations, additions or modifications made by the SD DOC during the term of the agreement.  Id. at IV.A.2.  Within six months of the agreement, the SD DOC must submit to the DOJ plans to provide ADA accessible cells with mobility features in sufficient numbers to meet the needs of each prison's population of inmates with mobility disabilities.

112

Id. at IV.A.3.  The architect must conduct annual inspections of both prisons in order to ensure compliance with the settlement agreement.  Id. at VI.B.

Inmates with disabilities currently being housed in segregated areas because of a lack of ADA accessible cells must be moved within six months and integrated to the greatest extent possible consistent with and appropriate to the needs of such inmates.  Id. at IV.B.  The agreement requires the SD DOC to provide benefits, aids or services to disabled inmates to the same extent as to nondisabled inmates including work, education, recreation, and early release opportunities.  Id.

The SD DOC is required within two weeks of the agreement to provide a shower chair for disabled inmates who cannot use a transfer shower.  Id. at IV.B.1.d.  The SD DOC must also ensure that wheelchairs and other adaptive equipment is clean, repaired, and maintained in safe operable condition.  Id. at IV.B.1.e.  The SD DOC must also provide other appropriate assistive devices such as canes, trapeze bars, prostheses, orthopedic shoes, braces, air mattresses, and other medically necessary equipment to meet the needs of disabled inmates.  Id.  The agreement also covers the provision of adaptive services for hearing- and sight-impaired inmates.  Id. at IV.C & D.

The SD DOC is required to submit periodic status reports to the DOJ on its efforts to implement the terms of the settlement agreement.  Id. at VIII.A.  In addition, the DOJ is granted full and complete access to all MDSP and SDSP records, including inmate records.  Id. at VIII.C.  The SD DOC must ensure that all relevant current and future staff, including contractors, are made

113

aware of, understand, and implement the terms of the settlement agreement. Id. at IX.D.

Although this court has concluded Mr. Maday is not entitled to injunctive relief on any of his ADA claims in this lawsuit, were the court to conclude otherwise, it would be asking the parties to explain and address how individual injunctive relief in this case would be different from, or any more effective than, the settlement agreement already in place with the DOJ.

## I.    Motion to Strike—Docket No. 155

Mr. Maday filed a motion to strike all of the affidavits submitted by defendants in support of their summary judgment motions.  See Docket No. 155.  Mr. Maday asserts defendants' proffered affidavits are not in conformity with FED. R. CIV. P. 56(c)(4) which require affidavits based on personal knowledge by a witness competent to testify.  Mr. Maday asserts defendants' affidavits do not satisfy this requirement because they are based "on information and belief."   Mr. Maday also challenges defendants' use of these affidavits because they all include review of Mr. Maday's institutional prison file or medical files, which Mr. Maday asserts are notoriously inaccurate. Mr. Maday characterizes defendants' affidavits as having been submitted "in bad faith."

Defendants submitted 12 affidavits in support of their motions.  See Docket Nos. 127-38.  All begin with the formulaic statement, "I, [name] being first duly sworn upon oath, and based on information and belief, depose and state as follows:"  See, e.g. Docket No. 127 at p. 3.  However, despite defense

114

counsel's unfortunate use of legalese in drafting these affidavits, it is clear that

each of them suffices as proper evidence under Rule 56(c)(4).

Part (c) of Rule 56 provides as follows:

> (1) ***Supporting Factual Positions***.  A party asserting that a fact
> cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record,
> > including depositions, documents, electronically stored
> > information, affidavits or declarations, stipulations . . .
> > admissions, interrogatory answers, or other materials; or
> >
> > (B) showing that the materials cited do not establish the
> > absence or presence of a genuine dispute, or that an adverse
> > party cannot produce admissible evidence to support the
> > fact.
>
> (2) ***Objection That a Fact Is Not Supported by Admissible
> Evidence***.  A party may object that the material cited to support or
> dispute a fact cannot be presented in a form that would be
> admissible in evidence.
>
> (3) ***Materials Not Cited.***  The court need consider only the cited
> materials, but it may consider other materials in the record.
>
> (4) ***Affidavits or Declarations.***  An affidavit or declaration used
> to support or oppose a motion must be made on personal
> knowledge, set out facts that would be admissible in evidence, and
> show that the affiant or declarant is competent to testify on the
> matters stated.

See FED. R. CIV. P. 56(c).

In Perez v. Volvo Corp., 247 F.3d 303, 315 (1st Cir. 2001), the court

explained, however, that Rule 56(c) "requires a scalpel, not a butcher knife.

The  . . . court ordinarily must apply it to each segment of an affidavit, not to

the affidavit as a whole." Id.  On a motion for summary judgment, therefore,

the district court should disregard only those portions of an affidavit that are

inadequate pursuant to FED. R. CIV. P. 56(c), and consider the rest.  Id.

Here, Mr. Maday does not parse any of the 12 affidavits and point out what part of each affidavit is wrong or inaccurate. He operates with a bludgeon, not a scalpel, seeking the court's order striking the entirety of each and every one of defendants' affidavits based on his conclusory allegations that they are not based on personal knowledge and that the documents relied on are inaccurate. In his affidavit in opposition to summary judgment, Mr. Maday points out some alleged discrepancies in the record, but they are not material differences. For example, where one medical record records that Mr. Maday complained of heel pain, he asserts he actually told the prison medical staff he was in "extreme" pain. See Docket No. 174 at p. 8. This is not a material difference rending the medical record untrustworthy.

Defendants assert, correctly, that Mr. Maday's institutional files and medical files are documents admissible as business records under Federal Rule of Evidence 803(6). See FED. R. EVID. 803(6). The records are records "of an act, event, condition, opinion, or diagnosis" "made at or near the time by—or from information transmitted by—someone with knowledge" which was "kept in the course of a regularly conducted activity of a[n] . . . organization." Id. The "making of the record was a regular practice of that activity." Id. Such records are admissible unless the opponent shows "that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Id. Mr. Maday's sweeping generalization that defendants' prison and medical records are inaccurate does not suffice to show lack of trustworthiness of each paragraph of each of the 12 proffered affidavits.

116

In <u>Nader v. Blair</u>, 549 F.3d 953, 963 (5th Cir. 2008), a plaintiff, Nader, in an employment case objected to a summary judgment affidavit proffered by the employer, Blair, from an employee in Blair's human resources department. Nader pointed out that the employee in question had been hired by Blair *after* the pertinent events in Nader's case and so, he argued, the affidavit was not based on "personal knowledge" as required by Rule 56. <u>Id.</u> The court held the affidavit proper under Rule 56. <u>Id.</u> Although the employee did not personally create or witness the creation of the documents she reviewed in order to attest to facts in her affidavit, her testimony *was* based on her personal knowledge of the records themselves and of the record-keeping practices of Blair. <u>Id.</u>

Similarly, the Seventh Circuit held a district court should have considered an affidavit proffered under Rule 56 where the affidavit set forth facts from a job interviewer's score sheet from a job applicant's interview and the handwritten notes on the score sheet. <u>Thanongsinh v. Bd. of Educ.</u>, 462 F.3d 762, 776-77 (7th Cir. 2006). The affidavit was based on a business record that fell within Fed. R. Evid. 803(6). <u>Id.</u> The opponent argued the affidavit was not properly authenticated because the plaintiff did not present testimony from the person who created the score sheet and handwritten notes thereon. <u>Id.</u> at 777. The court rejected this argument, stating that under Rule 803(6), the author need not present testimony about the document, it is sufficient if the document custodian or any "other qualified witness" provides the basis for authentication. <u>Id.</u>  <u>See also</u> <u>FDIC v. Patel</u>, 46 F.3d 482, 484 (5th Cir. 1995) (accepting affidavits under Rule 56 based on affiants' review of documents kept

in the regular course of business, even though the affiants were not the creators of those documents).

In addition to the hearsay exception for business records, medical records have also long been accepted as a well-recognized exception to the hearsay rule in all types of litigation.  See FED. R. EVID. 803(4).  See also Kuiper v. Givaudan, Inc., 602 F.Supp.2d 1036, 1045 (N.D. Iowa 2009) (admitting statements of plaintiff's daughter contained in plaintiff's medical records that his home was "filthy" because statement was pertinent to diagnosing his medical condition).

In Kuiper the medical records were allowed into evidence against the plaintiff's wishes because this interpretation of Rule 803(4) is "widely accepted as a firmly rooted hearsay exception."  Id.  "This exception to the hearsay rule is premised on the theory that a statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility."  Id. (internal punctuation omitted) (citing White v. Illinois, 502 U.S. 346, 356)(1992)).  See also Eckert v. Bowen, 2013 WL 3884165 at *2 (E.D. Mo., July 26, 2013) (prisoner's objection to institutional medical records as hearsay is overruled where the custodian of the records properly authenticated them).

Institutional medical records are regularly relied upon by the federal courts in determining the merits of prisoner deliberate indifference claims. See e.g., Massey v. Hutto, 545 F.2d 45, 46 (8th Cir. 1976) (per curiam) (referring to Massey's medical records to describe his medical condition and

118

care and stating "on the basis of these records, we agree with the district court that Massey has not been the victim of deliberate indifference . . ."). See also Dulany v. Carnahan, 132 F.3d 1243 (8th Cir. 1997). Dulany was also a deliberate indifference case. After summary judgment was granted in favor of the defendants, the plaintiffs appealed, claiming they'd not been given adequate opportunity for discovery. The Eighth Circuit disagreed:

> The defendants voluntarily produced thousands of pages of documents, including the plaintiffs' medical records, the relevant institutional policies, and physician affidavits summarizing the plaintiffs' medical records and opining that the plaintiffs received medically appropriate and adequate care.
> ***
> Further, the record in this case was not inadequate upon which to make a summary judgment determination, because the defendants provided expert affidavits, the relevant prison policies, and all of the plaintiffs' medical records.

Id. at 1238-39.

The inmate's medical records were also relied upon to determine the summary judgment motion in Meuir v. Greene County Jail Employees, 487 F.3d 1115 (8th Cir. 2007). In that case, the prisoner claimed deliberate indifference based upon the treatment he received for his dental problems. Id. at 1118. The district court granted the defendants' motion for summary judgment, and Mr. Meuir appealed. The Eighth Circuit affirmed, noting "[i]n the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment." Id. at 1119 (citing Dulany, 132 F.3d at 1240).

119

Mr. Maday's objection to reliance on his medical records by defendants' affiants is therefore rejected.

Defendants have presented 12 affidavits with a total of 481 separate paragraphs. The longest of these, Dr. Mary Carpenter's affidavit, is 156 paragraphs long, as would be expected since the majority of Mr. Maday's claims center on physical/medical conditions and Dr. Carpenter is both a licensed physician and the Medical Director of Correctional Health Care. See Docket No. 138 at p. 3, ¶¶1-3. Dr. Carpenter has extensive experience with the provision of health care in South Dakota's correctional institutions. Id. Mr. Maday's conclusory allegations do not suffice to undermine the whole of each of defendants' affidavits. Accordingly, the court denies his motion to strike.

**J.      Motion for Discovery and for Appointment of Counsel**

Mr. Maday has also filed with the court two motions for discovery and for the appointment of counsel pursuant to FED. R. CIV. P. 56(d). See Docket Nos. 175 & 176. Mr. Maday seeks a lawyer so that the lawyer can examine the materials filed under seal by defendants—here, that consists of the SI swimsuit editions for 2015 and 2016. See Docket Nos. 126-127 through -130. Defendants did not provide copies of these exhibits to Mr. Maday as they consist of contraband within the MDSP. Mr. Maday asserts he needs a lawyer and an expert witness to examine these documents in order to allow him to respond adequately to defendants' summary judgment motions. See Docket No. 175.

Mr. Maday also asserts he need to depose physicians' assistant Brad Adams and Dr. Terence Pederson "in order to effectively counter defendants' Motion for Summary Judgment." See Docket No. 176. He asks for appointment of counsel to conduct these depositions. Id. Even though Mr. Maday does not reference these matters in his Rule 56(d) motions, the court has also considered the following paragraphs from defendants' statement of undisputed facts to which Mr. Maday responded in his affidavit that he needed further discovery in order to respond: See Docket Nos. 140 & 174, both at ¶¶34, 35, 40, 41, 152, 183, 198, 199, 203, 218, 233, 244, 247, 255, 269, & 270.

Mr. Maday relies on FED. R. CIV. P. 56(d) to deny summary judgment. FED. R. CIV. P. 56(d) provides:

> (d)  When Facts Are Unavailable to the Nonmovant.
> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1)  defer considering the motion or deny it;
> (2)  allow time to obtain affidavits or declarations to take discovery; or
> (3)  issue any other appropriate order.

Usually, summary judgment is proper "only after the nonmovant has had adequate time for discovery." Toben v. Bridgestone Retail Operations, 751 F.3d 888, 894 (8th Cir. 2014) (citations omitted). Nonmovants may request a Rule 56(d) continuance "if they otherwise cannot present facts sufficient to justify their opposition. This option exists to prevent a party from being unfairly thrown out of court by a premature motion for summary judgment." Id.

121

(citations omitted).  A Rule 56(d) continuance is only appropriate, however, if
the movant files an affidavit which affirmatively shows how the discovery or
delay he seeks will allow him to rebut the movant's showing that there is an
absence of a genuine issue of material fact.  Id.

FED. R. CIV. P. 56(d) does not require trial courts to allow parties to
conduct discovery before entering summary judgment.  Anzaldua v. Northeast
Ambulance Fire Protection Dist., 793 F.3d 822, 836 (8th Cir. 2015).  The
district courts possess discretion when presented with a Rule 56(d) motion.  Id.
The court's is discretion is somewhat restricted, however, when the summary
judgment motion at issue is based upon qualified immunity.  Id.  This
restriction "reflects the concern that insubstantial claims against government
officials be resolved prior to discovery and on summary judgment if possible."
Id. (punctuation altered, citation omitted).

When the summary judgment motion pending is based upon qualified
immunity, it is not enough for the Rule 56(d) movant to "set forth some facts
[he] hopes to elicit from further discovery."  Id. at 837 (citations omitted).
Instead, the party making the Rule 56(d) motion must "show that the facts
sought exist."  Id. (citations omitted).

Further, a court presented with a Rule 56(d) motion must exercise its
discretion with an eye toward balancing the movant's demonstrated need for
discovery against the burden the discovery will place upon the opposing party.
Harbert Int'l. Inc. v. James, 157 F.3d 1271, 1280 (11th Cir. 1998).  "In
qualified immunity cases, the Rule 56(d) balancing is done with a thumb on

the side of the scale weighing against discovery." Id.  In Harbert the court

cautioned that once a defendant raises the qualified immunity defense, "the

trial court must exercise its discretion in a way that protects the substance of

the  . . . defense.  It must exercise its discretion so that officials are not

subjected to unnecessary and burdensome discovery or trial proceedings." Id.

(citing Crawford-El v. Britton, 523 U.S. at 597- 598).  See also Garner v. City of

Ozark, 587 Fed. Appx. 515, 518 (11th Cir. 2014) (affirming district court's

denial of plaintiff's Rule 56(d) motion in a qualified immunity case, explaining

"the basic thrust of the qualified immunity doctrine is to free officials from the

concerns of litigation, including the avoidance of disruptive discovery," (citing

Ashcroft v. Iqbal, 556 U.S. 662, 685 (2009))).

In Lykken v. Brady, 2008 WL 1930029 (D.S.D, Apr. 30, 2008), the

plaintiffs argued it was inequitable for the defendants to be allowed to assert

qualified immunity, stay discovery, and then file a fact-intensive summary

judgment motion.  Id. at *2.  In Lykken, the plaintiffs asked the district court to

allow certain discovery before ruling on the summary judgment motion.  Id.

The district court exercised its discretion and allowed some, but not all of the

plaintiff's requested discovery.  Id. at *3.  The court narrowly tailored the

permitted discovery to allow resolution of the plaintiff's allegations, while at the

same time—as directed by the United States Supreme Court--protecting the

defendants from the burdens of discovery until after the qualified immunity

issue was decided.  Id. at * 3.  The court endeavored to do the same here.

Mr. Maday's claims center very substantially on his medical issues. The court previously required defendants to provide to Mr. Maday the entirety of his medical records as discovery, including kites and records from outside providers like Dr. Pederson. See Docket Nos. 37 & 57.

Here, Mr. Maday has not established grounds for denying summary judgment pursuant to Rule 56(d), nor for appointing counsel or allowing further discovery. A lawyer and expert witness are not necessary to evaluate the 2015 SI swimsuit edition magazine. The court is perfectly capable of observing the images contained therein and comparing those to the SD DOC pornography policy to see if they are banned under that policy. It is not a matter for expert opinion. As to the 2016 magazine, the court concludes Mr. Maday did not exhaust his remedies as to that claim, so no decision is being made based on the contents of the magazine.

Mr. Maday indicates he wishes to take the deposition of PA Brad Adams and Dr. Pederson, but he never specifies what evidence he believes those gentlemen possess that would defeat defendants' summary judgment motion. Mr. Maday has the medical records from both of these medical care providers. Brad Adams has previously been dismissed from this lawsuit because Mr. Maday did not state a claim against him. See Docket Nos. 96 & 113. Mr. Maday has failed to establish with sufficient specificity the evidence he seeks to obtain from these witnesses if they were deposed.

Finally, with regard to the 16 paragraphs in defendants' statement of undisputed material facts to which Mr. Maday indicated he needed discovery,

124

the court finds none of those paragraphs are material to the court's legal analysis. Therefore, they are taken as denied for purposes of summary judgment. Even so, the court concludes as indicated in great detail above that summary judgment is appropriate in this case. The court gives its rationale briefly as to the indicated paragraphs:

--¶¶34-35 & 40-41: this concerns a November, 2014, inquiry from defendant Klimek, a non-medical prison staff person, to medical staff regarding Mr. Maday's need for New Balance shoes. The response from medical staff was drawn directly from Mr. Maday's medical records to that point. Other evidence (the medical records) establish the pertinent facts. Whether Klimek inquired about those facts is not material to the court's analysis. Nonmedical staff like Klimek cannot render medical diagnoses but must follow medical judgments by medical staff. Medical staff did not diagnose a need for New Balance shoes for Mr. Maday until December 18, 2014.

--¶152—this concerns whether health services ever represented to Mr. Maday during the 13-day period his arch supports had been taken away by defendant Cropper that they would make efforts to retrieve his arch supports for him. This is immaterial to the court's analysis because the court concludes Mr. Maday has shown no deleterious effect of the deprivation of arch supports for this 13-day period.

--¶183—this concerns whether Mr. Maday qualified as handicapped for purposes of using the handicapped recreation area. The fact is immaterial because the court found Mr. Maday was not entitled to money damages on this claim due to the fact he did not establish defendants acted intentionally to discriminate against him on the basis of his disability. Mr. Maday himself admits that he is not now mobility-disabled. Accordingly, any claim for injunctive relief is moot. Whether Mr. Maday would have qualified to use the handicapped recreation area at some point in the past is not relevant.

--¶¶198-199—this concerns the merits of Mr. Maday's First Amendment claim based on the 2016 SI swimsuit edition. The court does not reach the merits of this claim because

Mr. Maday did not administratively exhaust this claim. Accordingly, the facts are immaterial.

--¶203—this concerns what actions defendants took to eliminate inmates' access to pornography through the downloading of album art on their tablets. The fact is immaterial. The court concluded that defendants' efforts to eradicate pornography in MDSP is not rendered unconstitutional simply because some determined inmates are able to evade the policy.

--¶218—this concerns whether defendants' policy against colored paper was supported by a legitimate penological goal of eliminating the introduction of narcotics and other illegal drugs into prison. The court concluded that Mr. Maday's claim in this regard was simply an argument that defendants did not follow their own policy, which did not state a constitutional claim. In addition, the court finds defendants' justification for the policy is adequate under <u>Turner</u> even if there have been no actual instances of illegal drugs entering MDSP in this manner or even if defendants are mistaken about the potential for introduction of illegal drugs into prison in this manner.

--¶233—this concerns the merits of Mr. Maday's denial of access to the courts claim based on defendants' refusal to give him postage at defendants' expense to mail a letter addressed to the Wisconsin State Bar Association. The court did not reach the merits of this claim because Mr. Maday failed to exhaust his administrative remedies as to the claim. Accordingly, this fact is irrelevant to the court's analysis in support of recommending summary judgment be entered.

--¶¶244 & 247—this concerns emails from the Wisconsin Department of Corrections concerning provision of Wisconsin legal materials to Mr. Maday. The court has determined that Mr. Maday has not established an actual injury for purposes of his access to the courts claim based on denial of Wisconsin law. Therefore, the court finds this fact irrelevant to the court's analysis.

--¶255—this concerns Mr. Maday's Wisconsin post-conviction lawyer ending her representation of Mr. Maday. Mr. Maday himself submitted a document, a letter from this lawyer, indicating the same fact. <u>See</u> Docket No. 173-1 at pp. 130-31. Therefore, because Mr. Maday admits this fact, there is no need for discovery. To the extent there is any discrepancy

between defendants' statement of undisputed fact in their ¶255 and Mr. Maday's letter from his lawyer, the court takes the facts as established in Mr. Maday's exhibit.

--¶¶ 269-70—these paragraphs have to do with whether Mr. Maday's very brief confinement in the holding cell outside the SHU in April, 2018, was the result of a legitimate mistake. As stated above, the court disregards defendants' stated reasons for this action. The court recommended granting summary judgment to defendants because Mr. Maday never established any nexus between this incident and his protected activity of filing a PREA complaint or filing his complaint in this case.

Based on the above, the court denies Mr. Maday's attempt to divert the granting of summary judgment in favor of defendants based on Rule 56(d). The matters Mr. Maday identifies with sufficient specificity are not relevant to this court's analysis for recommending summary judgment be granted.

Because the defendants have asserted the qualified immunity defense, the court must balance Mr. Maday's need for information versus the burden placed on the defendants, with the "thumb on the side of the scale weighing against discovery." Harbert, 157 F.3d at 1280. Thus far, however, Mr. Maday has not provided anything other than his own hope that deposing the people he wishes to depose will uncover the existence of facts necessary to defeat the defendants' motion for summary judgment which is based on the qualified immunity doctrine. Mr. Maday's hope is not enough to justify subjecting the defendants to the burdens of such "disruptive discovery." Garner, 587 Fed. Appx. at 518; Anzaldua, 793 F.3d at 836. This is especially true where, as here, defendants have already provided Mr. Maday literally hundreds of pages of medical records.

**K.**    **Motion to Amend Complaint**

Mr. Maday filed a motion seeking the court's permission to amend his complaint to add additional claims.  See Docket No. 165.  He did not, as required by local court rules, file along with his motion his proposed amended complaint.  Id.  See DSD LR 15.1.  However, the court assumes Mr. Maday would, if his motion were granted, file the supplemental complaint found at Docket No. 162.  That supplement would add two claims and three new defendants.

Motions to amend should be freely given in order to promote justice, but may be denied when such an amendment would be futile.  Plymouth Cty., Iowa, 774 F.3d at 1160; FED. R. CIV. P. 15(a).  Leave to amend is denied only if evidence exists "such as undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment."  Roberson v. Hayti Police Dep't., 241 F.3d 992, 995 (8th Cir. 2001) (citing Foman v.Davis, 371 U.S. 178, 182 (1962)); Ingrim v. State Farm Fire & Casualty Co., 249 F.3d 743, 745 (8th Cir. 2001).  Motions to amend should be denied when the amendment would be futile.  Plymouth County, Iowa v. Merscorp, Inc., 774 F.3d 1155, 1160 (8th Cir. 2015); Becker v. Univ. of Neb. at Omaha, 191 F.3d 904, 908 (8th Cir. 1999) (citing Gamma-10 Plastics, Inc. v. American President Lines, Ltd., 32 F.3d 1244, 1255 (8th Cir. 1994)).  Here, the court denies the amendment because it would be futile.

One of the two new claims Mr. Maday seeks to assert is another First Amendment claim based on Sergeant Cory Tyler's denial of a Guns and Ammo magazine on February 7, 2019.  See Docket No. 162 at p. 3-4.  The stated reason for the denial, according to Mr. Maday, is that the magazine contained a schematic drawing of a firearm.  Id.  There are two problems with this claim. First, Mr. Maday cannot possibly have exhausted his administrative remedies as required by the Prison Litigation Reform Act.  He claims Sergeant Tyler withheld the magazine on February 7, 2019.  The supplemental complaint was filed February 13, 2019, not even a week later.  There is no allegation in the proposed supplemental complaint that Mr. Maday filed an IRR and followed up by filing an AR concerning this action.

The second issue with this First Amendment claim is that the prison's legitimate penological interests in maintaining security within the MDSP is clearly undermined by allowing a magazine containing a schematic drawing of a firearm to circulate within the prison.  The court cannot imagine a set of circumstances under the Turner analysis where such a magazine would be allowable in prison.

In the Murchison case, violence of the Mexican drug cartels was depicted in Newsweek magazine article.  Murchison, 779 F.3d at 885, 888.  Prison officials refused to allow the magazine to be delivered to an inmate in prison, citing security concerns.  Id.  The Eighth Circuit, applying Turner, agreed with the prison officials.  Id. at 888-93.  Although the magazine article did not advocate for violence or glorify violence, the court accepted prison officials'

129

judgment that the mere depiction of such violence would have an unfavorable effect on peace and security within the prison. Id. at 888-90. The court noted the inmate had other avenues to read about drug cartels in Mexico through other materials. Id. at 891. The court anticipates a like conclusion here with regard to an (unexhausted) claim that prison officials violated the First Amendment by refusing to allow a schematic of a firearm to circulate within prison walls. Furthermore, the First Amendment does not require prison officials to sift through magazines page by page and tear out offending pages. Thornburgh v. Abbott, 490 U.S. 401, 418-19 (1989).

The second of the two claims Mr. Maday would assert, if allowed, in his supplemental complaint is another denial of access to the courts claim. See Docket No. 162 at pp. 1-3. Again, Mr. Maday premises his claim on the allegation he is not getting consistent access to Wisconsin law and that law is not being updated as frequently as other inmates get updates on South Dakota law. Id. As with Mr. Maday's other access to the courts claims, he fails to demonstrate actual injury.

He again makes reference to his Wisconsin state habeas petition that is currently pending, to a federal petition under § 2254, and to his failing to file a petition for a writ of certiorari to the United States Supreme Court. Id. As discussed above, Wisconsin law is irrelevant to a federal § 2254 petition or a Supreme Court certiorari petition. Mr. Maday needs access to federal law for these two matters and he has access to federal law.

The denial, if true, of complete access to Wisconsin law is not germane. As to his Wisconsin petition, he has already litigated one state habeas petition with aid of counsel, so that petition was not affected by Mr. Maday's lack of access to Wisconsin law.  His second petition is currently pending and he fails to articulate any permanent disadvantage he has suffered in that petition as a result of defendants' actions.

In a case very closely analogous to this one, the district court's denial of a motion to amend the complaint was affirmed on appeal.  Moses.com Securities, Inc. v. Comprehensive Software, 406 F.3d 1052, 1066 (8th Cir. 2005).  The reasons relied upon for denying the motion to amend were that numerous motions to dismiss had already been filed, briefed and decided and discovery was well underway.  Id.  No abuse of discretion was found in the district court's decision.  Id.

Here, this case has been pending for over a year.  Defendants' summary judgment motions have been pending for many months.  Although Mr. Maday has sought numerous extensions of time to respond to those motions, alleging he is unable to find the time to research and write his response, he has in the interim peppered the court with other seemingly dilatory motions such as a motion to "remove" the Wisconsin defendants to Wisconsin federal district court (Docket No. 148), the motion to strike the affidavits (Docket No. 155), motions for temporary and permanent injunctions (Docket No. 152), and the motion to amend (Docket No. 165).  The court cannot help but believe if

131

Mr. Maday applied his resources to responding to the summary judgment motions, he would have been in a position to file his response some time ago.

The court concludes allowing Mr. Maday to file his supplemental complaint would be futile.  It is evident on the face of his supplemental complaint that both new claims would immediately be subject to dismissal.  In addition, the motion is quite possibly interposed for dilatory reasons.  The court denies the motion.

**L.    Motions for Sanctions by Both Parties**

Both Mr. Maday and defendants move for sanctions against each other, complaining about the method of service of their respective summary judgment pleadings on each other.  <u>See</u> Docket Nos. 170 & 184.  The court denies both motions as moot.  It is patently obvious that each party received the others' pleadings.  Furthermore, the court granted Mr. Maday numerous and generous extensions of time to respond to defendants' summary judgment motions.  Ultimately, Mr. Maday had approximately 3 months to respond.  Therefore, if defendants' method of service added a few days to the delivery time, it did not prejudice Mr. Maday.

**CONCLUSION**

Based on the foregoing facts, law and analysis, this magistrate judge hereby ORDERS that Mr. Maday's motion to strike [Docket No. 155], motion to file a supplemental complaint [Docket No. 165], motion for sanctions [Docket No. 170], and motions for discovery and appointment of counsel [Docket Nos.

175 & 176] are DENIED.  Defendants' motion for sanctions [Docket No. 184] is also DENIED.

This court further respectfully RECOMMENDS that defendants' motions for summary judgment [Docket Nos. 125 & 145] be granted in part and denied in part.  The sole portion of Mr. Maday's claims this court recommends be allowed to go forward is his claim for injunctive relief regarding the February 2015 Sports Illustrated swimsuit edition.

### NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).  Objections to this court's Recommendations will be reviewed de novo.  See FED. R. CIV. P. 72(b)(1); 28 U.S.C. § 636(b)(1)(b).  Objections to this court's Orders will be reviewed to determine if they are clearly erroneous or contrary to law.  See FED. R. CIV. P. 72(a); 28 U.S.C. § 636(b)(1)(A).

DATED March 8, 2019.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge